

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-19-1995

# United States of America v. Neadle

Precedential or Non-Precedential:

Docket 94-7417

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"United States of America v. Neadle" (1995). *1995 Decisions.* Paper 312.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/312

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-7417


UNITED STATES OF AMERICA

v.

LAWRENCE NEADLE, JR.,

Appellant.


On Appeal from the District Court of the Virgin Islands,
Division of St. Croix
(D.C. Criminal Action No. 92-cr-00113-2)


Argued April 17, 1995

Before: BECKER, NYGAARD and ROTH, <u>Circuit Judges</u>

(Opinion Filed  December 19, l995)

Thurston T. McKelvin, Esq. (Argued)
Federal Public Defender
Stephen A. Brusch, Esq.
Assistant Federal Public Defender
P.O. Box 3450
Christiansted, U.S. Virgin Islands 00822-3450

        Attorneys for Appellant

W. Ronald Jennings
United States Attorney
James R. Fitzner (Argued)
Assistant U.S. Attorney
1108 King Street - Suite 201
Christiansted, St. Croix
U.S. Virgin Islands 00820

          Attorneys for Appellee

OPINION OF THE COURT


ROTH, <u>Circuit Judge</u>:


      Appellant Lawrence Neadle, Jr., pled guilty to one count of mail fraud.  At sentencing, the district court imposed a sixty-month term of imprisonment and a three-year term of supervised release.  On appeal, Neadle contends that the district court misapplied the United States Sentencing Guidelines ("Guidelines") in its calculation of the victims' loss under U.S.S.G. § 2F1.1(b) and its upward departure based on the amount of that loss.  He also alleges that the court erred in granting an upward departure based on psychological harm to the victims and on loss of confidence in the insurance industry.  We hold that the district court properly calculated the loss arising from the appellant's fraud and that it did not err in its upward departure based on the amount of loss.  We find, however, that the district court erred in its conclusion to depart upward for psychological harm/loss of confidence.  We will, therefore, for the reasons stated below, vacate defendant's sentence and remand for resentencing pursuant to this opinion.

**I.**

**A.**

The appellant, Lawrence M. Neadle, Jr., and two co-defendants were indicted on one count of conspiracy and eight counts of mail and wire fraud on November 18, 1992. After one co-defendant was acquitted, a superseding indictment charged Neadle and the other co-defendant with substantially the same offenses. Count I of the Superseding Indictment charged them with a conspiracy in violation of 18 U.S.C. § 371; Counts II and III charged them with mail fraud in violation of 18 U.S.C. §1341; and Counts IV through IX charged them with wire fraud in violation of 18 U.S.C. § 1343.

In October 1993, Neadle changed his plea to Count II of the superseding indictment (mail fraud) from not guilty to guilty. Pursuant to the plea agreement, the remaining counts against him were dismissed at sentencing. On July 6, 1994, the district court sentenced Neadle to sixty months imprisonment and placed him under supervised release for a three-year period upon his release from prison. Neadle was released pending appeal and filed his notice of appeal the next day.

The charges against Neadle arose from his creation of the American Property and Casualty Insurance Company ("AMPAC"). Neadle was chief executive officer of the company. In late 1987, he applied to the Division of Banking and Insurance of the Virgin Islands ("Insurance Division") for a license to form AMPAC. At that time, the Insurance Division required an insurance company to have a minimum capital of $450,000, an initial surplus capital of $250,000, and a bond of $500,000. Neadle provided the

3

Insurance Commissioner with a surety bond for $500,000 but misrepresented the amount of the company's initial capital.[0]

On January 5, 1988, Neadle caused a letter to be sent through the United States mail to the Insurance Division, stating that AMPAC had unencumbered certificates of deposit in the sum of $700,000 in the Naples Federal Savings and Loan Association ("Naples Federal") in Naples, Florida. In fact, however, the certificates were encumbered, as Neadle was fully aware. Unaware of the deception, the government of the Virgin Islands in January 1988 issued AMPAC a license to do business in that territory.

After obtaining the loan for the certificates of deposit, AMPAC paid interest on the loan of $2,300 a month. AMPAC's quarterly reports to the Insurance Division, however, listed the $700,000 in encumbered certificates as an asset but did not list that amount as an offsetting liability, and the reports did not include the interest payments.

In September 1989, Hurricane Hugo hit the Virgin Islands. AMPAC was unable to meet the resulting claims of its policyholders. The Virgin Islands government established the Hurricane Hugo Fund Program to pay the claims for AMPAC and American Alliance, the other Virgin Islands insurance company that failed as a result of claims arising out of the hurricane.

**B.**

---

[0] Subsequently, the Insurance Division became concerned about the surety company, which had issued the bond, and required Neadle to post the $500,000 in cash. Neadle complied.

At the July 12, 1993, pre-trial hearing in this matter, witnesses testified regarding the Insurance Division's capital requirements. Derek Hodge, the Lieutenant Governor and Insurance Commissioner of the Virgin Islands at that time, testified that he would not have certified a company to do business without the $700,000 minimum in capital and paid-in surplus. Hodge also stated that he followed guidelines, promulgated by the National Association of Insurance Commissioners, requiring all insurance companies to maintain a solvency ratio of three to two in premiums to surplus. He further testified regarding the methods he used to ensure that insurance companies doing business in the Virgin Islands complied with the requirements. He stated that, among other things, he reviewed audits conducted by Insurance Commission examiners, who reviewed quarterly financial statements submitted by the companies.

Deverita Sturdivant, Director of the Insurance Division from January 1987 through the end of 1989, testified that the $700,000 minimum capital requirement applied to new businesses. She stated that once a company started writing policies, the company might need to increase its capital to ensure the proper premium dollars to surplus ratio. Sturdivant testified further that had she discovered that AMPAC did not meet the minimum capital requirement, the Insurance Division could have demanded that unencumbered assets be infused into the company or, in the alternative, that the company be liquidated.

In May 1994, the district court held a hearing to address the defense objections to the Presentence Investigation

and Report.  Ricardo Luaces, a claims examiner employed by the Insurance Division from 1989 to 1993, testified that the gross figure for Hurricane Hugo losses incurred on property insured by AMPAC was $37,655,038.  The adjusted Hurricane Hugo claims of AMPAC policyholders amounted to $24,438,748.  Roland Riviere, an independent insurance adjuster retained to assist in adjusting the claims of AMPAC's insureds for Hugo-related damage, quoted the same figure.

John McDonald, the Chief Examiner for the Insurance Division during the time that the Insurance Division compiled Hugo-related claims, testified that the best estimate of non-Hugo related claims on AMPAC was $500,000.  He further testified that, in early 1988, the Insurance Division had discovered that AMPAC had no general ledger -- the basic accounting format in which debits and credits are captured -- so that AMPAC's assets and liabilities could not be determined.  At that time, the Commission also detected a commingling of funds between AMPAC and Caribbean Mutual, another of Neadle's companies.  McDonald testified that the Commission directed Neadle to correct these accounting problems but that by the time of the hurricane, there were still no accounting records from which AMPAC's assets could be determined.  McDonald confirmed, however, that one of Neadle's accountants, Norman Erasso, had begun implementing the requested accounting procedures.  Erasso, however, left the territory when Hugo struck and did not return.

Neadle testified that, as of the date of the hurricane, he had reinsurance of $4 million.  He contended the reinsurer had

6

assured him that this amount would be adequate, based on previous hurricane damage in the Virgin Islands.

### C.

At sentencing, the district court applied the 1988 edition of the Sentencing Guidelines, the version in effect on the date of the offense.[0] The court found that because Neadle "obtained his license [to issue insurance] by fraud and trickery," he was responsible for a loss of $20,438,748, which represented the adjusted claims of $24,438,748, less AMPAC's $4 million in reinsurance. Appendix ("App.") at 399–400. Pursuant to § 2F1.1(b)(L) of the 1988 Guidelines, the base level for fraud offenses was 6; if the loss exceeded $5,000,000, an eleven level increase was to be added to the base. The court granted this eleven level increase.

Pursuant to U.S.S.G. § 2F1.1(b)(2), the court also awarded a two level increase on the alternative grounds that the crime involved more than minimal planning or more than one victim. The court concluded

> that the offense was by its nature more complex than simple; that the defendant did take significant affirmative steps to conceal the offense; that the

---

[0] The district court properly applied the version of the Guidelines in effect at the date of the offense because, at the time of sentencing, § 2F1.1 of the Guidelines had been amended by adding four new offense level increases for losses exceeding 10, 20, 40 and 80 million dollars. This amendment would call for a 16 level increase over the base offense level for the loss as calculated here, rather than the 11 level increase which had been in effect until November 1989. See, e.g., United States v. Corrado, 53 F.3d 620, 622–23 (3d Cir. 1995) (if application of guidelines in effect at sentencing results in more severe penalty than that in effect at time of offense, earlier version controls; applying a guideline amendment that enhances the penalty offends the ex post facto clause of the United States Constitution).

> offense itself required planning and the falsification of a series of documents; and that these acts involved a series of discrete decisions, clearly not opportune in nature.

App. at 404-05. Moreover, the court stated "that the hundreds of policyholders and the government comprise the victims of the offense." App. at 405. The court granted a two level decrease for Neadle's acceptance of responsibility.

The court then departed upward from the guideline offense level on two grounds. First, pursuant to U.S.S.G. §2F1.1, comment 10, the court found that the fact that the loss amounts were substantially above the highest amount listed in the Guidelines ($5,000,000) warranted an upward departure. Looking by analogy to the 1993 amendments to the Guidelines, the court departed upward a further five levels (from level 11 to 16), which corresponded to the increase under the 1993 version of the Guidelines for a loss exceeding $20,000,000. Second, the court found U.S.S.G. § 2F1.1, comment 9, to warrant an upward departure of one level for the "psychological harm risked or caused by the offense" and one level for "the loss of confidence in an important institution."

In sum, the court departed upward seven levels from an offense level of 17 to an offense level of 24, which corresponded to a guideline sentencing range of from 51 to 63 months. The court then imposed a sentence of 60 months.

## II.

The District Court of the Virgin Islands had jurisdiction pursuant to 18 U.S.C. § 3241. We have jurisdiction,

pursuant to 28 U.S.C. § 1291, to review a final order of a district court and, pursuant to 18 U.S.C. § 3742, to review a sentence imposed under the United States Sentencing Guidelines. We exercise plenary review over legal questions concerning the meaning of sentencing guidelines but apply the clearly erroneous standard to factual determinations underlying their application. United States v. Daddona, 34 F.3d 163 (3d Cir.), cert. denied, __ U.S. __, 115 S. Ct. 515 (1994); United States v. Katora, 981 F.2d 1398, 1401 (3d Cir. 1992).

### III.

We first address Neadle's challenge to the district court's interpretation of "loss" as it is calculated pursuant to U.S.S.G. § 2F1.1(b), an issue over which this court exercises plenary review. See United States v. Badaracco, 954 F.2d 928 (3d Cir. 1992). We conclude that the district court properly calculated the loss, arising from the appellant's fraud, to be $20,438,748, that figure being the net, adjusted $24,438,748 loss to victims whose property was insured with AMPAC at the time that Hurricane Hugo struck St. Croix, reduced by the amount of AMPAC's reinsurance ($4 million).

In his appeal, Neadle raises two grounds for challenging the district court's calculation of the amount of loss. First, he argues that, after obtaining the license to form AMPAC, he intended to run the company in a proper, business-like way. Second, he contends that the property losses suffered by AMPAC policy holders resulted from an unforeseeable act of God, so that he would have been unable to pay the claims even in the

9

absence of his fraud.  Therefore, he maintains, the loss figure should not be used to increase his sentence pursuant to U.S.S.G. § 2F1.1.

The district court based its computations upon the actual loss suffered by the AMPAC policyholders, rather than upon the loss which Neadle intended to inflict, see U.S.S.G. § 2F1.1, comment 7 (1993) ("if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss)[0] or upon the offender's gross gain from committing the fraud, see Badaracco, 954 F.2d at 936 (breach of fiduciary duty by officer of a financial institution may justify using the "gross gain" alternative to estimate loss).  The court also sentenced Neadle based on the loss as of the date of sentencing, see United States v. Kopp, 951 F.2d 521, 531 (3d Cir. 1991), rather than the loss as of the date of the offense, see Shaffer, 35 F.3d at 115, so that the reinsurance Neadle had contracted for was subtracted from the loss.

Neadle characterizes the case as analogous to a contract case in which he was planning to perform, albeit after obtaining the contract by fraudulent means.[0]  He argues that

---

[0]In a fraud case, the intended loss may be no loss at all, when fraud is committed to obtain a contract or a license or a loan to do business which the offender hopes will succeed -- as the defendant here claims was his intent.  See e.g. United States v. Shaffer, 35 F.3d 110, 113 (3d Cir. 1994).  However, under the Guidelines, intended loss is relevant in the loss computation only if the intended loss is greater than the actual loss.

[0]     The government portrays this fraud case as analogous to a simple theft case, arguing that the "property" taken was the

10

because he did not intend to inflict any loss, no dollar amount is attributable to him.  App. at 397.  He emphasizes that when the government requested that he provide $500,000 cash in lieu of the $500,000 bond required by law, he complied.  Moreover, he notes that his accountant, Erasso, had begun to comply with the government's accounting suggestions but left the Virgin Islands when Hugo struck.  Finally, he maintains that he attempted to get adequate reinsurance coverage and that he did not engage in, and the government did not prove that he engaged in, day-to-day fraud in the operation of AMPAC.

Contrary to Needle's argument, however, there is strong record support that Neadle not only misrepresented the amount of his initial capital investment but also engaged in fraudulent conduct to perpetuate his business.  During the eighteen month period in which AMPAC sold insurance policies, the Insurance Division could not locate basic accounting records from which it could assess the company's assets and liabilities.  Moreover, examiners found a commingling of funds between AMPAC and another of Neadle's companies, Caribbean Mutual.  In addition, the company continued to file financial statements that fraudulently concealed the fact that AMPAC's $700,000 in certificates of

---

receipt of the license to sell casualty insurance in the Virgin Islands, which resulted in the Hugo-related losses.  The Government argues that "the sentencing court could properly have assessed the loss occasioned by the appellant's fraud as being the value of all property insured by AMPAC, including property that was not damaged by Hurricane Hugo."  Even if we were to accept the Government's position, this court has held that "[t]he fraud guideline . . . has never endorsed sentencing based on the worst-case scenario potential loss."  Kopp, 951 F.2d at 529.

11

deposit at Naples Federal were encumbered assets.000 in certificates of deposit at Naples Federal were not unencumbered assets. Finally, although Neadle obtained reinsurance, no reinsurer could adequately assess AMPAC's true reinsurance requirements unless the reinsurer was provided with basic records indicating AMPAC's assets and liabilities. The deceitful and slipshod way in which Neadle ran the business supports the district court's attribution of responsibility to him for the losses. We conclude that the actual loss caused to AMPAC policyholders by the fraud was the proper basis for the loss computation under § 2F1.1(b).[0]

We also find Neadle's argument that Hurricane Hugo was an act of nature beyond his control and that the property losses occasioned thereby should not be used in calculating his sentence to be without force. Hurricanes are a continuing threat in the Caribbean. Coverage for hurricane damage is a type of coverage which is often specifically sought, albeit not always easily found, in that area. Moreover, the insurance policies at issue contained express coverage of hurricane-related property losses.

---

[0] We do not agree with the dissent that the loss to the policyholders here was not caused, at least in part, by Neadle's fraud in obtaining the license to do business. The dissent implies that the individuals, who purchased policies from AMPAC, could not have purchased insurance coverage from any other source and for that reason did not suffer any loss from the damage done by Hurricane Hugo which they would not otherwise have suffered. However, despite the tightness of the insurance market in the Virgin Islands, the record before us does not support the supposition, and Neadle does not claim, that there was no other insurance coverage available in the Virgin Islands market for the AMPAC policy holders.

12

Neadle did not attempt to sell hurricane coverage in Chicago or in Wichita; he sold it in the Caribbean, a hurricane zone.

Moreover, as we have previously held in Kopp, it is not appropriate to reduce the amount of the loss, as computed under the Guidelines, in order to reflect other causes of the loss which were beyond the defendant's control. 951 F.2d at 531. See U.S.S.G. § 2F1.1(b), comment 11. An intervening force that increases a fraud-related loss will not decrease the loss valuation but will only provide possible grounds for a downward departure. Kopp, 951 F.2d at 531.

To the extent that the defendant's objection to the loss computation in this case can be construed to be a request for a downward departure based on the nature of the risk involved, the district court clearly rejected that request in the court's determination to depart upward in computing the amount of the loss. The district court, in determining to depart upward due to the underrepresentation of the loss in the 1988 version of the Guidelines, cited United States v. Monaco, 23 F.3d 793 (3d Cir. 1994). App. at 411. In that case, we vacated the district court's judgment and remanded for resentencing after clarifying the scope of the court's power to depart downward based on application note 11 to U.S.S.G. § 2F1.1. We stated that "a wrongdoer should [not] completely escape a sentencing enhancement if his scheme involved a substantial risk of loss merely because, under his own rosy scenario, no loss was intended." Monaco, 23 F.3d at 799 n.10. We held that the court's discretion to depart downward pursuant to application note 11 is limited by the

inherent risk of loss in the perpetrator's fraud, explaining that "risk is one of the losses that a perpetrator of fraud imposes on his victims." Id.

We believe that the district court properly considered the risk, in this case of a hurricane, an act of God, imposed on AMPAC's insureds because of the defendant's fraudulent conduct. Had Neadle expressly made a request for a downward departure for an act of God, the court would have been proper in denying it. In holding AMPAC out as insuring against a known risk, defendant extracted premiums from unsuspecting policyholders who believed that they were securing protection when in fact that protection was an empty shell. Moreover, defendant's misrepresentations persisted throughout the period AMPAC was operating.

Neadle's arguments obscure the fact that but for his fraud, he would not have been in the insurance business. By deceiving the government concerning the $700,000 certificates of deposit, by submitting fraudulent quarterly financial statements, and by failing to maintain financial records, Neadle misled the government for approximately a year and a half. Had such fraudulent conduct not occurred, AMPAC would not have begun to operate as an insurance broker in the Virgin Islands and would not have continued to do so without maintaining adequate accounting records. The district court recognized a clear causal connection between the fraud and the policy holders losses. See App. at 399-400.

Our decision finds support in United States v. Robichaux, 995 F.2d 565 (5th Cir.), cert. denied, __ U.S. __, 114

14

S. Ct. 322 (1993).  In Robichaux, the Fifth Circuit addressed a similar case in which mail and wire fraud led to the failure of an insurance company.  The defendant, Edward Robichaux, misrepresented that securities he had assigned to an insurance company were unencumbered assets.  Without the assets, the company "would have been undercapitalized and thus barred from any further insurance business."  Id. at 567.  The Louisiana Insurance Commission retained an independent firm to audit the company.  Robichaux verified to that firm the company's ownership of the securities in question.  Relying on the verification, the auditors issued a favorable report.  Approximately two years later, the insurance company was declared insolvent.  Id.

Robichaux argued that, for purposes of the Sentencing Guidelines, he should be held responsible only for the commissions he had been paid by the insurance company after he had made the fraudulent assignment of assets to it.  The district court, however, held him responsible for the losses attributable to the company's failure.  The Fifth Circuit agreed, holding that it was not clearly erroneous for the district court to find that the losses attributable to the insurance company's failure resulted from the defendant's actions in placing fraudulent securities on the company's books.  Id. at 571.  The court concluded that it was

> not clearly erroneous to assume that if [the independent auditor] had not issued a favorable audit for [the insurer], which only occurred because of [the insurer's] fraudulently inflated balance sheet, the Commission would have acted to liquidate the firm at an earlier date and minimized the losses.

Id.. The court upheld the district court's loss estimate -- an estimate of the loss that the state of Louisiana suffered as a result of the insurance company's failure -- as reasonable and not clearly erroneous. Id.

Similarly, we find not clearly erroneous the district court's conclusion that Neadle's inadequate financing and recording at AMPAC caused the government of the Virgin Islands to license AMPAC and to permit it to remain in business which in turn caused the policy holders' Hugo-related losses. We will affirm the district court's loss figure, because it is a reasonable estimate of the harm which resulted from Neadle's fraudulent scheme and which reasonably could be expected to result from a scheme which insured for hurricane damage in the Caribbean hurricane zone.

**IV.**

We next must consider whether the court erred by reading U.S.S.G. § 2F1.1, Application Note 9, to warrant an upward departure of one level for the "psychological harm risked or caused by the offense" and one level for "the loss of confidence in an important institution." Since we are reviewing the district court's application of particular facts to a departure approved by the Sentencing Commission, we review only for clear error. United States v. Astorri, 923 F.2d 1052, 1058 (3d Cir.), cert. denied, 502 U.S. 970 (1991). We conclude that the evidence is insufficient to warrant an upward departure on either ground.

16

A district court may impose a sentence outside the sentence range prescribed by the Sentencing Guidelines where "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Application Note 9 to U.S.S.G. § 2F1.1 provides a nonexclusive list of circumstances in which the loss calculated pursuant to U.S.S.G. § 2F1.1 -- the provision establishing the base level for offenses involving fraud or deceit -- "does not fully capture the harmfulness and seriousness of the conduct." Among the examples of circumstances in which upward departures may be warranted are those on which the district court relied, instances in which "the offense caused or risked physical or psychological harm"[0] and instances in which "the offense caused a loss of confidence in an important institution."

At sentencing, the court granted a one point upward departure based on "the psychological and social impact [of Neadle's offense] on the people of the Virgin Islands." An

---

[0] Neadle argues that the district court improperly applied the 1988 edition of the Guidelines to this ground of departure. The 1993 edition of the Guidelines provides that an upward departure may be warranted where "the offense caused reasonably foreseeable, physical or psychological harm or severe emotional trauma." U.S.S.G. § 2F1.1, comment 10(c). Neadle suggests that the 1993 provision should apply, because it clarifies, rather than substantively changes, the 1988 language. We need not consider this argument, because we do not find evidence of psychological harm within the meaning of the Guidelines in any event.

upward departure based on psychological harm is appropriate only "[i]f a victim or victims suffered psychological injury much more serious than that normally resulting from the commission of the offense."  U.S.S.G. § 5K2.3.  The Guidelines state that

> [n]ormally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns.

Id.

A district court is to be given considerable deference in assessing psychological impact on victims.  United States v. Astorri, 923 F.2d at 1058-59.  However, the court must not merely speculate regarding psychological harm.  In the instant case, the record is barren of evidence regarding physical or psychological harm sustained by the victims.  We do not find any evidence of the sort of "chronic substantial impairment of a victim's mental functioning" upon which this court has relied in upholding upward departures based on psychological injury.  See id. at 1059 (upholding upward departure for psychological harm where evidence showed, among other things, that victim suffered from high blood pressure and remained under doctor's care as a result of defendant's actions).  Therefore, we cannot find that the victims suffered psychological or physical harm, which exceeded that

occurring in the heartland of fraud offenses, to such a degree as to justify an upward departure.[0]

The court also granted a one point upward departure on the grounds that "[t]he offense itself contributed materially to the destruction of the reputation of the insurance industry in the territory."  App. at 410.  The court stated that "[t]here is no doubt in the court's mind that Neadle's acts contributed substantially to a loss of confidence in an important institution."  App. at 411.  Again, the court based the upward departure not on sworn testimony but on an unsupported judicial conclusion.[0]   Such judicial speculation cannot provide the basis for an upward departure.

**V.**

---

[0]     See United States v. Pelkey, 29 F.3d 11, 15–16 (1st Cir. 1994) (finding that victims' feelings of lack of trust, frustration, shock, and depression were not "so far beyond the heartland of fraud offenses as to constitute psychological harm within the meaning of the Policy Statement in § 5K2.3 or" the application note to § 2F1.1); United States v. Mandel, 991 F.2d 55, 58–59 (2d Cir. 1993) (finding psychological injuries of victims insufficient to warrant upward departure from base offense level where "both the base offense level for fraud and the vulnerable–victim adjustment had already taken into account the harm to the victims").

[0]     The lack of evidence supporting this ground for departure is evident from the record of the hearing at which Neadle raised his objections to the Presentence Report.  Asked for evidence regarding loss of confidence in the industry, the government attorney merely cited conversations with fifteen AMPAC insureds who "did not hold the insurance industry in very high regard," meetings "with people on the street," and evidence from "reading newspapers."  App. at 230–31.  Indeed, based on the hearing, the court weakened the original language of the report to state broadly that the offense "contributed to the general decline in the confidence and esteem held for the insurance industry."  App. at 231.

19

We conclude that the district court correctly calculated the loss arising from Neadle's fraud as the net, adjusted loss to those victims whose property was insured with AMPAC at the time Hurricane Hugo struck St. Croix, reduced by the amount of the company's reinsurance. Nevertheless, we will vacate the judgment of sentence and remand this case for resentencing, because the district court improperly increased Neadle's guideline sentence by two levels, based on caused or risked physical or psychological harm and on loss of confidence in the insurance industry.

United States of America v. Lawrence Neadle, Jr., Appellant
No. 94-7417

BECKER, Circuit Judge, concurring and dissenting.

This appeal presents an important question regarding the definition of "loss" under the fraud section of the United States Sentencing Guidelines ("Guidelines" or "USSG"), USSG §2F1.1(b). We must determine whether this definition incorporates a causation requirement, and if so, what that requirement entails. Because the majority fails to explicitly address this issue, and because I disagree with the majority's conclusion as to the determination of loss, I do not join in Parts III and V of the majority opinion. I do join, however, in Parts I, II, and IV.

The majority affirms the district court's calculation of loss without giving sufficient attention to the nexus between Lawrence Neadle's illegal conduct -- misrepresentations that AMPAC had complied with the requirement that insurance companies have $700,000 in unencumbered assets -- and the $20 million in unpaid AMPAC claims. This inattention is not surprising given the Guidelines' lack of guidance on the definition of loss. Indeed, USSG § 2F1.1 seems to envision loss as a readily apparent financial harm existing independent of legal definitions.

While the amount of unpaid AMPAC claims may, at first glance, seem to be the relevant financial harm, the severe consequences of criminal penalties impose on courts the duty to undertake a more searching inquiry. Legal concepts must be susceptible to definition, and it is our duty to explicate these definitions. We have performed this task before, see, e.g., United States v. Kopp, 951 F.2d 521 (3d Cir. 1991) (defining loss

2

under USSG § 2F1.1), and it is now necessary to do it again.  The Guidelines' language, its commentary, the caselaw, and sound sentencing policy all lead me to conclude that a financial harm is loss under section 2F1.1 only if it was caused by the defendant's illegal conduct.  This causation requirement demands, at the least, that the defendant's conduct be a "cause in fact" of the harm at issue, i.e., that the harm would not have occurred but for the defendant's conduct.

I dissent because, applying the "but for" standard, the record contains insufficient evidence to find that Neadle's fraud was a cause of the $20 million in unpaid claims.  Because of this error in loss calculation, I would vacate and remand for resentencing.

## I. Causation as an Element of Loss

In my view, the Guidelines require a finding of causation before a harm may be used as loss for purposes of section 2F1.1.  The causation requirement, pervasive in the criminal law, see infra part II, is made explicit in the language of the Guidelines and is buttressed by caselaw and policy considerations.

### A. The Language of the Sentencing Guidelines

The plain language of the Guidelines dictates that courts must make a finding of causation before assigning some harm as loss under section 2F1.1.  Although the text of section 2F1.1 contains no definition of the specific offense

3

characteristic loss, the Guidelines provide for such deficiencies by establishing default rules that govern, <u>inter alia</u>, what conduct and harms are relevant to determining specific offense characteristics.  One of these default rules makes clear that courts may consider only those harms that were caused by the defendant's conduct.  Because no other provision of the Guidelines provides instructions to the contrary, this default rule governs the determination of loss under section 2F1.1.

Because the loss table in effect at the time of sentencing -- the 1993 loss table -- would provide for a greater penalty than would the loss table in effect at the time of the offense -- the 1988 loss table -- the 1988 Guidelines apply in their entirety.[0]  Thus, except where noted, my discussion is based on the 1988 Guidelines.

---

[0]USSG § 1B1.11(b)(1) (1994) states that "[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the <u>ex post facto</u> clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."  USSG § 1B1.11(b)(2) (1994) then states that "[t]he Guidelines Manual in effect on a particular date shall be applied in its entirety."  <u>See generally</u> <u>United States v. Corrado</u>, 53 F.3d 620 (3d Cir. 1995) (explaining this "one book rule").  Because the loss table in effect at the time of sentencing provides for more jail time per dollar of loss than do earlier versions of the loss table, <u>see</u> majority opinion note 3, the Guidelines applicable at the time of the offense apply in their entirety.

The question then is:  what version of the Guidelines was in effect at the time of Neadle's offense?  The majority and the district court apply the 1988 edition of the Guidelines, which incorporates amendments effective October 15, 1988.  They do this despite the fact that there is a strong argument that the offense for which Neadle was convicted occurred on January 5, 1988. Pursuant to a plea agreement, Neadle was convicted of only the mail fraud charge alleged in count two of the indictment.

4

## 1. Section 1B1.3

The text of section 2F1.1 provides no definition of the term loss. It simply states that "[i]f the loss exceeded $2,000, increase the offense level as follows," and then provides a table of sentencing increases based on different amounts of loss. See USSG § 2F1.1(b). Thus, we must look elsewhere for the definition of loss.

The first place to look is Chapter 1, Part B of the Guidelines, which provides guidance on how to interpret the Guidelines' sometimes sparse provisions. Within this chapter, USSG § 1B1.3 specifies what information courts may consider in determining, inter alia, specific offense characteristics such as loss under 2F1.1. See USSG § 1B1.3(a). The information specified in section 1B1.3(a) is the only information relevant to determining specific offense characteristics "[u]nless otherwise specified" by another provision of the Guidelines. Id.; see also USSG § 1B1.3 Background ("Subsection (a) establishes a rule of construction by specifying, in the absence of more explicit

_____

Count two charges that the crime of mail fraud occurred on January 5, 1988, when Neadle mailed a letter to the Insurance Division stating that its assets were unencumbered. Nevertheless, the district court's judgment states that the offense was concluded on October 31, 1989. The district court's finding as to the duration of the offense seems justified by the fact that Neadle concealed his initial mail fraud by continuously filing false quarterly reports. Although it is unclear whether Neadle accepts the district court's finding as to the duration of his offense, he seems to acquiesce in the use of the 1988 Guidelines. Because of Neadle's acquiescence and the agreement of the government, the district court, and the majority that the 1988 Guidelines apply, I will use the 1988 Guidelines as well.

instructions in the context of a specific guideline, the range of conduct that is relevant to determining the offense level . . . .").

Section 1B1.3(a) establishes several important interpretive rules.  Subsection (a)(1) states that specific offense characteristics will be based only on the following conduct:  acts and omissions committed, aided and abetted by the defendant, or for "which the defendant would be otherwise accountable" (defined as conduct counseled, commanded, induced, procured, or willfully caused by the defendant, reasonably foreseeable acts in furtherance of a conspiracy, or, conduct underlying a conviction for solicitation, misprision or accessory after the fact that reasonably should have been known by the defendant)[0] "that occurred during the commission of the offense

---

[0]Application Note 1 defines "conduct 'for which the defendant is otherwise accountable'" as follows:

> Conduct "for which the defendant is otherwise accountable," as used in subsection (a)(1), includes conduct that the defendant counseled, commanded, induced, procured, or willfully caused.  If the conviction is for conspiracy, it includes conduct in furtherance of the conspiracy that was known to or was reasonably foreseeable by the defendant.  If the conviction is for solicitation, misprision or accessory after the fact, it includes all conduct relevant to determining the offense level for the underlying offense that was known to or reasonably should have been known by the defendant.

USSG § 1B1.3 Application Note 1 (citations omitted).  This definition has been, for the most part, incorporated into the text of the current version of section 1B1.3.  See USSG § 1B1.3(a)(1) (1994).  We may consider subsequent amendments to the

of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense." USSG § 1B1.3(a)(1).  Except for a special class of offenses —— "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts" —— this is the only conduct courts may consider absent an expression of contrary intent.[0]

More importantly, subsection (a)(3) establishes a causation requirement with respect to harms.  Unless otherwise specified, the only harm that is to be taken into account in determining a specific offense characteristic is harm "that <u>resulted from</u>" the acts and omissions identified above "if the harm . . . <u>was caused</u>" with the requisite level of intent, and harm that was "the <u>object of</u> such acts and omissions."  USSG §1B1.3(a)(3) (emphasis added).[0]  That the harm must be <u>caused</u> with some bad intent necessitates that the harm be <u>caused</u> in the

_____

Guidelines "to the extent that such amendments are clarifying rather than substantive changes."  USSG § 1B.11(b)(2) (1994).
[0]"Solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts," courts may also take into account "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction."  USSG § 1B1.3(a)(2).
[0]In full, Section 1B1.3(a)(3) states that courts may consider

> all harm or risk of harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, if the harm or risk was caused intentionally, recklessly or by criminal negligence, and all harm or risk that was the object of such acts or omissions.

USSG § 1B1.3(a)(3).

7

first place.  Furthermore, the plain meaning of "resulted from" connotes causation.  Indeed, Webster's Third New International Dictionary defines the verb "result" as follows:  "to proceed, spring, or arise as a consequence, effect, or conclusion." Webster's Third International Dictionary of the English Language 1937 (Philip Babcock Gove ed., 1966).  Thus, absent an expression to the contrary, a court may take into account only harm that "arose as a consequence" of the defendant's conduct -- and only if that harm was "caused" with some bad intent -- and (perhaps for offenses that were thwarted prior to their completion) harm that was "the object" or purpose of the defendant's conduct.[9]

---

[9]I recognize that subsequent versions of the Guidelines have deleted the requirement that the harm be caused with bad intent, as well as the "risk of harm" language.  In the 1994 Guidelines, for example, section 1B1.3(a)(3) states that courts may consider "all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions."  The Committee explained these changes as follows:

> The purpose of this amendment is to delete language pertaining to "risk of harm" and "state of mind" as unnecessary.  Cases in which the guidelines specifically address risk of harm or state of mind are covered in the amended guideline under subsection (a)(4) [formerly subsection (a)(5)].  In addition, the amendment deletes reference to harm committed "intentionally, recklessly, or by criminal negligence" as unnecessary and potentially confusing.

USSG Appendix C, Amendment 76, p. 86 (1994).  To the extent these changes can be characterized as "clarifying rather than substantive changes," which we are invited to take into account in understanding an earlier version of the Guidelines, see USSG §1B.11(b)(2) (1994), they do not change my view that the Guidelines establish a causation requirement.  Section 1B1.3(a)(3) retains the "resulted from" language, which, as I state in the text, connotes causation.

Because loss under section 2F1.1 is clearly a "harm" within the meaning of section 1B1.3, see USSG § 1B1.3 Application Note 3 (defining "harm" as "bodily injury, monetary loss, property damage and any resulting harm" (emphasis added)), section 1B1.3's requirement of causation applies. Thus, if no other Guideline provisions addressed the definition of loss, the bare statement in the text of section 2F1.1 to increase the defendant's sentence on the basis of loss must be read to include a requirement of causation.

## 2. Other Guidelines Provisions

Turning now to other provisions of the Guidelines that address the issue of loss, the question is not whether they explicitly state a causation requirement, but whether they contradict the rule of causation established by section 1B1.3. I conclude that the Application Notes to section 2F1.1, and the materials referenced therein, only reinforce 1B1.3's causation requirement.

Application Note 7 to section 2F1.1 deals specifically with the definition of loss, but it provides little guidance. It states as follows:

> Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss. For example, if the fraud consisted of attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the

9

> "loss" would be treated as $40,000 for
> purposes of this guideline.

USSG § 2F1.1 Application Note 7.

The Commentary to section 2B1.1 (the Guideline for "Larceny, Embezzlement, and Other Forms of Theft"), referenced above, provides slightly more guidance:

> "Loss" means the value of the property taken, damaged or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim. When property is damaged, the loss is the cost of repairs, not to exceed the loss had the property been destroyed.

USSG § 2B1.1 Application Note 2. Thus, for theft and similar crimes, the Guidelines state that "'[l]oss' means the value of the property taken, damaged, or destroyed."

This definition certainly does not negate section 1B1.3's background rule of causation. If anything, the definition itself suggests a causation requirement. Implicit in this definition is that loss means the value of the property taken, damaged, or destroyed <u>by the defendant</u>. The terms "taken," "damaged," and "destroyed" have meaning only insofar as there is a subject -- a taker, damager, or destroyer. In this context, the subject must be the defendant -- the person being sentenced for taking, damaging, or destroying some property. In other words, loss for purposes of section 2B1.1 is the value of

10

the property that the defendant <u>caused</u> to be taken, damaged, or destroyed.[0]

Another provision touching on the concept of loss is Application Note 8 to section 2F1.1, which deals with loss estimation. It states:

> The amount of loss need not be precise. The court is not expected to identify each victim and the loss he suffered to arrive at an exact figure. The court need only make a reasonable estimate of the range of loss, given the available information. The estimate may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. Estimates based upon aggregate "market loss" (<u>e.g.</u>, the aggregate decline in market value of a stock resulting from disclosure of information that was wrongfully withheld or misrepresented) are especially appropriate for securities cases. The offender's gross gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

USSG § 2F1.1 Application Note 8. This provision's discussion of loss estimation does not undercut the background requirement of causation.

The only provision that explicitly mentions the issue of causation is Application Note 11. It states:

> In a few instances, the total dollar loss that results from the offense may overstate

---

[0] As I explain below, <u>see</u> <u>infra</u> section I.B, we have held that loss for purposes of section 2B1.1 is not identical to loss for purposes of section 2F1.1, despite the latter's reference to the former's definition. My point here is simply that nothing in the commentary to section 2B1.1 undercuts the rule that only harms in some sense caused by the defendant can be assigned as loss under section 2F1.1.

its seriousness.  Such situations typically occur when a misrepresentation is of limited materiality or is not the sole cause of the loss.  Examples would include understating debts to a limited degree in order to obtain a substantial loan which the defendant genuinely expected to repay; attempting to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it; and making a misrepresentation in a securities offering that enabled the securities to be sold at inflated prices, but where the value of the securities subsequently declined in substantial part for other reasons.  In such instances, a downward departure may be warranted.

USSG § 2F1.1 Application Note 11.

The phrase "when a misrepresentation is . . . not the sole cause of the loss" might suggest that the loss figure can include harms not caused by the defendant.  But this is a misreading of the Application Note.  That the defendant's conduct need not be the <u>sole</u> cause of the loss in no way excuses that conduct from being <u>a</u> cause.[0]  The availability of a downward

---

[0]My view is not changed by subsequent amendments to the Application Notes to section 2F1.1.  Even if these amendments are given weight as "clarifying" changes, I do not find them sufficient to overcome the background rule of causation.  In lieu of Application Note 11, Application Note 7 to section 2F1.1, which deals specifically with the definition of "loss," now contains an additional paragraph:

There are, however, instances where additional factors are to be considered in determining the loss or intended loss:

. . . .

(b)  <u>Fraudulent Loan Application and Contract Procurement Cases</u>

In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the

12

loss has not yet come about, the
expected loss).  For example, if a
defendant fraudulently obtains a loan by
misrepresenting the value of his assets,
the loss is the amount of the loan not
repaid a the time the offense is
discovered, reduced by the amount the
lending institution has recovered (or
can expect to recover) from any assets
pledged to secure the loan.  However,
where the intended loss is greater than
the actual loss, the intended loss is to
be used.

In some cases, the loss determined above
may significantly understate or
overstate the seriousness of the
defendant's conduct.  For example, where
the defendant substantially understated
his debts to obtain a loan, which he
nevertheless repaid, the loss determined
above (zero loss) will tend not to
reflect adequately the risk of loss
created by the defendant's conduct.
Conversely, a defendant may understate
his debts to a limited degree to obtain
a loan (e.g., to expand a grain export
business), which he genuinely expected
to repay and for which he would have
qualified at a higher interest rate had
he made truthful disclosure, but he is
unable to repay the loan because of some
unforeseen event (e.g., an embargo
imposed on grain exports) which would
have caused a default in any event.  In
such a case, the loss determined above
may overstate the seriousness of the
defendant's conduct.  Where the loss
determined above significantly
understates or overstates the
seriousness of the defendant's conduct,
an upward or downward departure may be
warranted.

USSG § 2F1.1 Application Note 7 (1994).  In the second example in
this note -- the grain exporter example -- the Guidelines seem to
assign as "loss" a harm that would have occurred regardless of
the defendant's fraud.  The example assumes that the grain
exporter would have (1) obtained the loan whether or not he

13

departure for situations in which a misrepresentation is not the "sole cause" of the loss simply accounts for the fact that some events have multiple causes.  If causes beyond the defendant's control played a large role in the loss, a downward departure may be justified.  If anything, the Note's discussion of a misrepresentation that is not the "sole cause" of the loss implies that such misrepresentation is a cause of the loss, and the Note thus supports the need for a finding of causation.  See United States v. Kopp, 951 F.2d 521, 531 (3d Cir. 1991) ("Application Note 11 made it clear that actual loss was how much better off the victim would be but for the defendant's fraud.  To the extent actual loss had other, more proximate causes, a discretionary downward departure . . . might be appropriate." (emphasis added)).[0]

committed fraud; and (2) defaulted on the loan whether or not he committed fraud. Nevertheless, the example suggests that the lack of causation is a ground for downward departure, and thus, the argument goes, the lack of causation should not be factored into "loss" in the first instance.

I reject this argument for the same reasons that I state in the text.  In addition, I note that the grain exporter example is stated under the heading "Fraudulent Loan Application and Contract Procurement Cases," of which the present case is neither.

[0]The statements from Kopp quoted in the text shed light on some other confusing language from that case.  Language in Kopp arguably suggests that Application Note 11 mandates taking account of the lack of causation only by way of making a downward departure, and not by adjusting the amount of loss:

> The government is correct on one point,
> however:  Application Note 11 definitively
> rejected adjusting the "loss" itself downward
> to reflect other causes beyond the
> defendant's control.  As an example of when
> the dollar loss may overstate the seriousness

14

In the end, the Application Notes to section 2F1.1, and the materials referenced therein, only reinforce 1B1.3's causation requirement. Reading these materials together with the background rule of causation, the Guidelines seem to contemplate the following approach: The court should first make an estimate of the loss, i.e., the financial harm caused by the defendant. If the harm caused by the defendant was also caused by other factors beyond the defendant's control, the court should consider making a downward departure to better reflect the seriousness of the defendant's offense.

**B. Caselaw**

This Court's caselaw also suggests the presence of a causation requirement in the definition of loss. In <u>United States v. Kopp</u>, 951 F.2d 521, we exhaustively analyzed the definition of loss under section 2F1.1. We concluded that the definition of loss for fraud sentencing under section 2F1.1 is not the same as section 2B1.1's "amount taken" rule even though section 2F1.1 makes reference to section 2B1.1's definition of loss. See <u>id.</u> at 529 ("Application Note 7 to USSG § 2F1.1 does not say that the definitions of 'loss' for theft and fraud cases

---

of the defense and hence a downward departure may be appropriate, Application Note 11 included situations where the "misrepresentation . . . is not the sole cause of the loss."

951 F.2d at 531. However, this language was followed immediately by the statements quoted in the text, which make clear that we were speaking of situations in which the defendant caused the loss, but where other factors also played a causal role.

15

are identical, just that '[v]aluation of loss is discussed in the Commentary to § 2B1.1 . . . ."). In Kopp, the defendant procured a bank loan by means of fraudulent misrepresentations. The district court calculated loss as the full amount of the loan, despite the fact that the victim of the fraud -- the bank -- recovered most of the loan amount by selling the property securing the loan. In rejecting the government's argument that loss was appropriately calculated because the face value of the loan was the amount "taken," USSG § 2B1.1 Note 2, we sought to develop a sensible definition of loss for the fraud context. Thus, we defined "fraud 'loss' as . . . the amount of money the victim has actually lost." Id. at 536.[0]

Although we were not directly confronted with the causation issue we face here, we suggested that our definition of fraud loss as "the amount of money the victim has actually lost" incorporates a causation requirement. We stated, in response to the government's argument, that "Application Note 11 [of the original Guidelines] made it clear that actual loss was how much better off the victim would be but for the defendant's fraud." Id. at 531 (emphasis added). This "but for" statement is a classic articulation of the causation requirement. See infra part II. More importantly, the fairness concerns that drove Kopp are very much present in this case. In Kopp, we were concerned with the district court's assignment as loss a financial harm that had not occurred. Although the issue here -- the district

[0]The current Guidelines incorporate this definition of fraud loss. See USSG § 2F1.1 Application Note 7 (1994).

16

court's assignment as loss a financial harm that did occur but which may not have been caused by the defendant -- is perhaps analytically distinct, it shares the same basic problem: punishing the defendant for harm that he or she did not cause.

I also note that this Court and others have repeatedly suggested the need for finding causation in making a loss determination. See, e.g., United States v. Daddona, 34 F.3d 163, 170 (3d Cir.) (remanding for resentencing because the record did not contain any indication that the loss figure used by the district court "was due to the fraud of the appellants"), cert. denied, 115 S. Ct. 515 (1994); United States v. Marlatt, 24 F.3d 1005, 1007 (7th Cir. 1994) (applying proximate cause analysis in assessing the district court's determination of loss); United States v. Harper, 32 F.3d 1387, 1392 (9th Cir. 1994) ("What we do insist upon, however, is use of a realistic, economic approach to determining what losses he truly caused or intended to cause . . . ."), cert. denied, 115 S. Ct. 1162 (1995); United States v. Wilson, 980 F.2d 259, 262 (4th Cir. 1992) ("When the offense involves making a false statement, the inquiry to determine loss must focus on the amount of loss related to the false statement.").

### C. Policy Considerations

Finally, good sentencing policy requires that there be a causal link between the defendant's crime and the harm on which his or her sentence is based. This causation requirement effects two fundamental Guidelines sentencing policies: First, that

17

courts sentence defendants according to "the nature and degree of the harm caused by the[ir] offense[s]," United States v. Kopp, 951 F.2d 521, 529 (3d Cir. 1991) (quoting 28 U.S.C.A. § 994(c)(3) (West Supp. 1991)) (emphasis added); and second, that courts sentence similarly situated defendants similarly, see id.; USSG Part A, section 3, p. 1.2 (1988) ("Congress sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders.")  Sentencing defendants on the basis of fortuitous harm that they in no sense caused would thwart both of these policies.

## D. Conclusion

In summary, I am convinced that a harm cannot be considered loss under section 2F1.1 unless the defendant's conduct was a cause of that harm.  The causation requirement emanates from the interpretive principles of section 1B1.3, the provisions of the fraud and theft guidelines, and is supported by caselaw and policy considerations.  However, because of the sparse and sometimes confusing guidance provided by the Application Notes, I believe that the Sentencing Commission should articulate a comprehensive approach to determining loss. Until that time, I believe that my approach best harmonizes the many provisions at issue and best accords with fundamental sentencing policy.

## II. The Content of the Causation Requirement

18

Having established that the Guidelines contemplate a causation requirement in its definition of loss, I must now address the more difficult question of the content of the causation requirement. I need not, however, establish a comprehensive definition of causation under the Guidelines, for the figure approved by the majority -- the $20 million in unpaid claims -- fails even the most minimal causation test. In addition, it would be unwise to embark on such an ambitious task when subsequent cases faced with concrete problems can better resolve the various issues raised.

The notion of causation runs throughout the law -- including the criminal law -- and it is generally understood to encompass two concepts. A defendant's conduct must generally be both the "cause in fact" and the "proximate cause" of some harm before liability is imposed. See Wayne R. LaFave & Austin W. Scott, Jr., 1 Substantive Criminal Law § 3.12, at 393-99 (1986); Richard A. Epstein, Cases and Materials on Torts 363-64 (5th ed. 1990); 4 Fowler V. Harper et al., The Law of Torts § 20.2, at 89-90, § 20.4, at 130-33 (2d ed. 1986) ("Harper, James, & Gray"); W. Page Keeton et al., Prosser and Keeton on The Law of Torts § 41, at 263-65 (5th ed. 1984) ("Prosser & Keeton"). While neither of these concepts are susceptible to uncontroversial definitions, a working understanding of them is useful.

The requirement of cause in fact purports to be an empirical test of whether the defendant's conduct was a necessary antecedent to the harm at issue. See, e.g., Harper, James, & Gray, supra § 20.2, at 89-91. The most common expression of

19

this test is the "but for" formulation:  the defendant's conduct is a cause in fact of some harm if the harm would not have occurred but for the defendant's conduct.  See LaFave & Scott, supra, at 393-94; Harper, James, & Gray, supra, § 20.2, at 91; Prosser & Keeton, supra, at 265-66.  LaFave and Scott note that the Model Penal Code and several state codes put forth the "but for" test explicitly.  See LaFave & Scott, supra, at 394 n.11 (stating that "Model Penal Code § 2.03(1) declares that conduct 'is the cause of a result when . . . it is an antecedent but for which the result in question would not have occurred'" and citing similar state codes).

Courts sometimes apply a different test -- the "substantial factor" formulation -- to special causation problems not adequately addressed by the "but for" test.  For example, when the conduct of each of two actors acting independently could have caused the harm at issue, and thus neither is the "but for" cause, courts generally hold both actors liable under the substantial factor test.  See, e.g., Prosser & Keeton, supra, at 268.

Proximate cause, on the other hand, is a more explicitly policy-based determination of whether an actor's conduct, despite its being a cause in fact, is too tenuously linked to the injury to hold the actor liable.  See, e.g., Prosser & Keeton, supra, § 42, at 272-73 (5th ed. 1984).  Courts have used various different tests to address this issue.  See, e.g., id. at 273-80.

20

In this case, we are concerned only with the requirement of cause in fact.[0]  Because the facts do not present any special causation problems, I need only apply the standard "but for" test.  I now turn to a review of the facts and application of the "but for" test to them.

### III. Application of the Causation Requirement

### A. The Misrepresentation

I take issue with the majority's assertion that on the facts of this case, there is a "clear causal connection between the fraud and the policy holders' losses."  Neadle's only fraud was in misrepresenting that he had $700,000 of unsecured assets backing his insurance venture.  In order to conclude, as the majority and district court do, that this fraud was a "but for" cause of the over $20 million in unpaid claims, one must make the following inferences:  first, that had Neadle not committed fraud, he would not have obtained an insurance license; second, that the AMPAC insureds would have thus purchased insurance from other insurance companies; and third, that these insurance companies would have paid all of their Hurricane Hugo related claims.[0]  While these inferences might be plausible in theory,

_____

[0]It may ultimately be appropriate to hold that only harm proximately caused by the defendant's conduct can be deemed "loss."  See United States v. Marlatt, 24 F.3d 1005, 1007 (7th Cir. 1994) (applying proximate cause analysis to a district court's determination of loss).  However, it is unnecessary to reach this question on the facts of this case.

[0]These inferences were explicit in the district court's opinion:

> If the defendant had not obtained his license
> by fraud, he would not have been in a

21

there is no evidence in the record to support them.  In fact, record evidence undercuts the plausibility of such inferences.

First, there is no evidence that Neadle would have been unable to obtain an insurance license without committing fraud.  Given his ability to post $500,000 in cash when his surety bond was called into question, he might have found backers for another $700,000.  If Neadle had obtained a license legitimately, he could have issued insurance to the same policy holders, and AMPAC still would have been unable to meet the $24 million in Hurricane Hugo claims.  At best, the policyholders would have obtained an additional $700,000.[0]

Second, no record evidence supports the inference that had AMPAC not been in the insurance business, AMPAC policy holders would have purchased insurance from other companies. This is a striking omission given the recent history of the unavailability of insurance in the Virgin Islands.  Indeed, the record shows that only local companies wrote policies for the same kinds of customers and coverage that AMPAC did, and that there were few local companies in operation.  Deverita

---

> position to issue insurance coverage and would not have had the customers or policyholders he did have.  Therefore, the policyholders would have obtained coverage from other insurance companies, companies that did meet Hurricane Hugo claims.

[0] Even if AMPAC had initially held an additional $700,000 in unencumbered assets, it is unclear that the government or the policyholders would have obtained these funds.  An insurance company, once qualified, is not required to keep the full $700,000 as part of its capital structure.  Subject to certain limitations, an insurance company can "make use of its surplus for the development of its business."  22 V.I. Code § 465.

Sturdivant, then director of Banking and Insurance, testified before the grand jury as follows:

> Considering the fact that we had very few companies operating in the territory at the time that [Neadle] came on board, as I said, we had a mass exodus of companies from the territory in '85 and we had chaos, basically with unauthorized companies in '87. And so by the time Mr. Neadle and a couple of other domestics came on the scene in '88, late '87, we felt that perhaps the market was turning around. The availability problem was no longer acute because people were receiving cover [sic]. And oftentimes the small domestic companies were willing to provide the kind of coverage that many of the larger companies would not provide. [The larger companies] often could pick and choose their clients.

Thus, one cannot assume that the AMPAC policy holders would have found insurance elsewhere.

Finally, the record is devoid of evidence supporting the inference that other insurance companies would have met all of their Hurricane Hugo claims. Rather, the record shows that at least one insurance company that did not misrepresent the amount of its assets, American Alliance, was unable to pay all of its Hurricane Hugo claims. The record also shows that most of the small domestic insurance companies -- possibly the only companies covering the same kinds of risks and policyholders as AMPAC -- lacked the assets necessary to cover the huge Hurricane Hugo losses. Sturdivant testified before the grand jury that "just about all of the companies that came on board, the small domestic companies, came with the minimum statutory capital and surplus requirements. They came with $1.2 million and that's it." If

23

AMPAC had not obtained a license to sell insurance, its customers may have purchased insurance from American Alliance or other companies unable to meet Hurricane Hugo claims.

On this record, then, I cannot conclude that Neadle's fraud was a cause in fact of AMPAC's inability to pay the over $20 million in claims. In summary: (1) had Neadle met the $700,000 requirement, AMPAC would still have been unable to pay the Hugo losses; (2) the district court's (and the majority's) intimation that other companies would have written the AMPAC policies is purely speculative and unsupported by the record; (3) if other companies were willing to provide the coverage AMPAC did, they may have been similarly undercapitalized; and (4) at least one other company that met the $700,000 requirement was unable to pay its Hugo claims.

## B. **United States v. Robichaux**

United States v. Robichaux, 995 F.2d 565 (5th Cir.), cert. denied, 114 S. Ct. 322 (1993), which the majority cites to support its decision, is distinguishable. In that case, the defendant misrepresented to an auditing firm hired by the Louisiana Insurance Commission that securities he had assigned to an insurance company were unencumbered. The firm relied on the defendant's statement and issued a favorable audit. Two years later, the company was declared insolvent. The Fifth Circuit upheld the district court's conclusion that the defendant was responsible for all of the losses attributable to the insurance company's failure.

24

Notably, the Fifth Circuit applied a cause in fact analysis similar to the one I describe in this opinion. However, it found that the district court's inferences were "plausible in light of the record read as a whole":

> It is not clearly erroneous to assume that if [the auditor] had not issued a favorable audit for [the insurance company], which only occurred because of [the company's] fraudulently inflated balance sheet, the Commission would have acted to liquidate the firm at an earlier date and minimized the losses.

Id. at 571.

The Fifth Circuit's holding that the district court's inferences were "plausible in light of the record read as a whole" says nothing about this case, where the record casts serious doubt on the plausibility of the district court's inferences. To the extent Robichaux supports a relaxed inquiry into causation -- which I do not think is the case -- I disagree with it for the reasons expressed in Part I.

### C. The Majority's Other Arguments

The remainder of the majority's reasoning fares no better. The majority asserts that "the deceitful and slipshod way in which Neadle ran the business" -- i.e., failure to keep proper books and misrepresentations in quarterly reports -- "supports the district court's attribution of responsibility to him for the [$20 million] losses." This assertion suggests two possible arguments, neither of which is convincing.

25

First, the majority might mean that Neadle's poor record-keeping was a cause of the unpaid AMPAC claims. Evidence in the record suggests that beyond the minimum capital requirements, the Insurance Division policed the funds of insurance companies to ensure that companies maintained adequate reserves in proportion to the coverage they wrote. Thus, if we assume that AMPAC was inadequately capitalized,[0] it is possible that if Neadle had kept accurate books, the Insurance Division might have discovered the inadequacy and taken remedial measures.

However, even if Neadle's poor accounting was, in some sense, a cause of the unpaid AMPAC claims, the Guidelines do not allow Neadle to be sentenced on the basis of this harm. Under section 1B1.3, only certain harms sufficiently connected to the defendant's criminal conduct can be used to calculate a specific offense characteristic. See supra part I. On a different record, it might be argued that Neadle's poor record-keeping was a means of hiding his misrepresentations and thus that harms caused by the poor record-keeping "occurred . . . in the course of attempting to avoid detection or responsibility for th[e] offense [of conviction]," USSG § 1B1.3(a)(1). But here no record evidence suggests that Neadle's lax accounting was a means of avoiding detection.

Second, the majority might be asserting that Neadle meant to use AMPAC essentially to rob his clients, and thus that he intended to cause some significant loss. Courts may sentence

---

[0]This assumption is probably not justified given the $4 million in reinsurance that AMPAC maintained. See infra.

26

defendants on the basis of "intended loss" if that figure is greater than actual loss. USSG § 2F1.1 Application Note 7; <u>see also</u> USSG § 1B1.3(a)(3) (stating that courts may consider harm that was "the object of" the defendant's conduct).

However, once again, there is no record evidence that Neadle intended any loss. In fact, the record is replete with evidence to the contrary. Neadle purchased $4 million worth of reinsurance, an amount, that according to his uncontroverted testimony, professionals had advised was sufficient. The Virgin Islands did not require that companies have any reinsurance, and no one in the Virgin Islands government told Neadle how much reinsurance AMPAC should carry. Until Hurricane Hugo, AMPAC paid claims promptly, and was never reprimanded or sanctioned by the Insurance Division for wrongful denial or failure to pay claims.

### D. The Proper Calculation of Loss

Having concluded that the bulk of the unpaid AMPAC claims was not caused by Neadle's misconduct and thus cannot be assigned as loss under section 2F1.1, I feel obligated to suggest how loss might appropriately be calculated. In so doing, I question the basic model employed by the district court and the majority -- that loss is based on the unmet claims of the policyholders.

One reasonable estimation of loss in this case is the $700,000 that Neadle misrepresented as unencumbered. Under the majority's model, $700,000 is a sensible loss determination on several grounds. Had Neadle not committed fraud and still obtained an insurance license, AMPAC would probably have $700,000

27

more in assets than it does now, and the AMPAC insureds would be that much better off.  Or, had the AMPAC insureds bought insurance from other legitimately formed insurance companies, the evidence suggests that these companies may have been similarly capitalized.

A different model for measuring loss that is consistent with the text and structure of section 2F1.1 would also generate a figure of $700,000.  The indictment charged Neadle with misrepresenting the status of the $700,000 to the Virgin Islands government.  If we focus on the Virgin Islands as the victim of the fraud, the loss is the governmental or societal loss of the $700,000 reserve.

Alternatively, we might measure loss in terms of what Neadle obtained by virtue of his fraud.  See  USSG § 2F1.1 Application Note 8; see also Kopp, 951 F.2d at 530 (stating that the defendant's gain can be used as a measure of loss when there is some loss but it is not measurable).  Here, Neadle obtained the premiums of the policyholders to whom he falsely represented were validly insured.  While I cannot derive this sum from the record, I surmise that it approaches $700,000 annually.

I do not deny that a sentence based on my suggested loss calculations might give Neadle less time than he deserves.  To rectify this problem, the district court could depart upward if the case meets the departure standard (although upper calibration would have to start at the proper base offense level).  See United States v. Kikumura, 918 F.2d 1084 (3d Cir.

28

1990).  If the resulting sentence is still too lenient, that is a problem that only the Commission can address.

## IV. Conclusion

For the reasons I have stated, the Guidelines require a finding of causation before some harm is deemed loss under section 2F1.1.  This requirement demands, at the least, that the defendant's conduct be a cause in fact of the harm.  Because the record contains insufficient evidence to find that Neadle's fraud was a cause in fact of the $20 million in unpaid claims, I respectfully dissent.