UNITED STATES of America, Appellee,

v.

Jack MANDEL, Defendant–Appellant.

No. 734, Docket 92–1007.

United States Court of Appeals, Second Circuit.

Argued Dec. 30, 1992.

Decided April 14, 1993.

David L. Lewis, New York City, for defendant-appellant.

Martin Coffey, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., Susan Corkery, Asst. U.S. Atty., of counsel), for appellee.

Before: OAKES, MINER and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Jack Mandel appeals from a final judgment of the United States District Court for the Eastern District of New York (John Bartels, *Judge*), convicting him, upon his guilty pleas, of two counts of mail fraud in violation of 18 U.S.C. § 1341 (1988). Mandel was sentenced to consecutive terms of sixty and thirty-six months' imprisonment.

Mandel argues that: (1) the district court erred in calculating his sentence under the United States Sentencing Guidelines (the "Guidelines"); (2) the district court's conduct at a *Fatico* hearing deprived him of his due process and confrontation rights; and (3) the district court's imposition of consecutive sentences violated Mandel's due process rights and subjected him to double jeopardy. For the reasons stated below, we vacate the sentence and remand for resentencing.

## BACKGROUND

Between 1979 and 1990, Mandel wheedled a small fortune from twenty victims by representing himself as an investment adviser. He relied heavily on his charm. He met most of his "investors"—all of whom were over sixty, and eighteen of whom were women—through dating services and personal advertisements from women in search of companionship. Mandel would win their trust, usually by winning their hearts. Having swept the women off their feet, he would casually mention that he was an investment advisor and offer them the benefit of his services. He was in fact a former stockbroker banned by the SEC. Excited by his guarantees of huge returns, they entrusted to Mandel amounts ranging from $10,000 to over $200,000. A hybrid of Lothario and Ponzi, Mandel often gave "promissory notes" or pledges that their money would be returned to them under a schedule of periodic payments. Mandel would make token payments to the victims for a short period of time and then disappear.

Indicted on fifteen counts of mail fraud, Mandel entered into a plea agreement to plead guilty to count one, involving a scheme to defraud Rose Waisner, and count six, a scheme to defraud Pauline Hoffman. Count one centered on Mandel's activities after November 1, 1987, and was therefore governed by the Guidelines. Count six involved conduct before that date, and therefore was not subject to the Guidelines.

The Probation Department prepared a presentence report ("PSR") asserting that Mandel had defrauded a number of other people apart from Rose Waisner and Pauline Hoffman. The PSR included letters from several of Mandel's victims, most notably Lenore Horowitz, all of whom wrote of the anguish that the fraud had caused them. The PSR calculated the loss suffered by all of his victims at $1,536,000, resulting in a base offense level of 18. U.S.S.G. § 2F1.1(b)(1). The PSR also recommended a two-level increase because the scheme involved more than minimal planning and more than one victim, § 2F1.1(b)(2), and a two-level, vulnerable-victim upward adjustment. § 3A1.1. This raised the total recommended offense level to 22, which, when combined with Mandel's criminal history category of I, resulted in a sentencing range of 41–51 months. Capping it off, the PSR indicated that an upward departure for serious psychological injury under § 5K2.3 might be appropriate.

Mandel denied any wrongdoing in the transactions to which he had not pled guilty, and he also disputed the sums of money involved. He demanded a *Fatico* hearing. *See United States v. Fatico*, 579

F.2d 707 (2d Cir.1978), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). At a three-day hearing, the government called eight of Mandel's victims, including Rose Waisner and Pauline Hoffman.

Ms. Waisner testified that she had met Mandel through a dating service, and later entrusted him with him $78,000 because of the very attractive interest rates he promised. She conceded that Mandel gave her promissory notes, but contended that she had regarded them as mere "piece[s] of paper." She said Mandel repaid only $6,000 of her money.

Ms. Hoffman's tale was not much different. Mandel took $10,000 from her, and ultimately returned only $3,500. Hoffman testified that Mandel's callous pilfering caused her to become "extremely upset," and she eventually suffered a "nervous breakdown." When the court asked Ms. Hoffman if Mandel's conduct had caused the nervous breakdown, she responded that: "I wasn't very happy about it, sir, you need to feel a little good."

Six other victims testified at the hearing, much to the same effect. The testimony of a ninth witness was introduced via a video-taped deposition that Mandel and his attorney, who cross-examined the witness, had attended. Testimony about nine of the victims was provided by Postal Inspector Sol Farash, who had interviewed seven other women. He also testified about letters he received from the only two male victims of the scheme.

Mandel testified at his *Fatico* hearing. He claimed that apart from the transactions that were the subject of his guilty plea, the monies he received were loans, not investments. He also disputed the amounts involved, stating that he had repaid more than the PSR acknowledged. Although the irony seemed to escape him, Mandel professed that he was unable to repay the "loans" because his girlfriend had absconded with his money. On cross-examination, however, he admitted that he had stopped payments to eight of the victims even before his girlfriend's perfidy.

*Sentencing*

The district court rejected Mandel's argument that the transactions were loans, explicitly crediting the victims' testimony over Mandel's, and at one point referring to Mandel's testimony as "unbelievable." Regarding count one, governed by the Guidelines, the court agreed with Mandel that the loss was less than that calculated in the PSR, and reduced it to $1,358,600, which—according to the court's calculations—resulted in a base offense level of 22.

The district court also departed upward four levels finding that "Pauline Hoffman and Lenore Horowitz ... suffered psychological problems as a result of" Mandel's scheme and that "[t]he magnitude and nature of the fraud and the harm to the victims justify [such] a departure." Adding this four-level departure to a base offense level of 22 resulted in an adjusted offense level of 26 with a corresponding sentencing range of 63 to 78 months. Recognizing that the statutory maximum for mail fraud is 60 months, the district court imposed that sentence together with three years of supervised release. In addition, the court sentenced Mandel to 36 months on count six (the pre-Guidelines count), ordering this sentence to be served consecutively to the 60–month sentence on count one.

## DISCUSSION

### The Calculation of Sentence

Mandel mounts several challenges to the district court's calculation of his sentence under the Guidelines (count one, Rose Waisner).

First, he contends that the district court erred when it departed upward four levels without giving explicit reasons for its rejection of each intermediate offense level. Mandel relies foursquarely on *United States v. Kim,* 896 F.2d 678 (2d Cir. 1990). However, we have recently explained that "*Kim* does not require that an offense-level departure be accompanied by a 'mechanical level-by-level review of the extent of the upward departure....' " *United States v. Merritt,* 988 F.2d 1298,

**58**

1311 (2d Cir.1993) (quoting *United States v. Rodriguez*, 968 F.2d 130, 140 (2d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 140, 121 L.Ed.2d 92, *and cert. denied,* — U.S. —, 113 S.Ct. 663, 121 L.Ed.2d 588 (1992)); *see also United States v. Pergola*, 930 F.2d 216, 220 (2d Cir.1991) ("the requirement of a specific step-by-step calculation and comparison is not particularly apt where, as here, (a) harm to the victim is at issue, and (b) the type of harm at issue is psychological rather than physical"). Accordingly, we reject Mandel's argument that the failure to ratchet the offense level upwards, notch-by-notch, constitutes reversible error *per se.*

Mandel also contends, more persuasively, that there was insufficient evidence to support the upward departure for psychological harm to the victims under § 5K2.3. A district court may impose upward departures under the Guidelines only when it "finds that there exists an aggravating … circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1988). "Thus, where the particular factor has already been considered in setting the base level, counting the factor again in making a departure violates § 3553(b) unless the factor is present in a degree which the Commission did not consider." *United States v. Campbell*, 967 F.2d 20, 24 (2d Cir.1992).

U.S.S.G. § 2F1.1, application note 10, observes that in a case where "the [monetary] loss … does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted." Specifically mentioned under Application Note 10(c) as a possible reason for departure is "physical or psychological harm" to the victim. An upward departure based on psychological injury is appropriate only when the injury is "much more serious than that normally resulting from commission of the offense," U.S.S.G. § 5K2.3, and

> only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous dura-

tion, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. *Id.*

The district court's explanation of its reasons for imposing the four-point upward departure was laconic. It noted that "[t]wenty individuals on the list were defrauded and suffered financial loss and pain and anguish from the fraud." More specifically, the court found that Pauline Hoffman and Lenore Horowitz "suffered psychological problems as a result of falling victim to Jack Mandel's scheme to defraud them of their savings." Based on these facts, the court concluded that the "magnitude and nature of the fraud and the harm to the victims justify a departure upward of 4 levels…."

▮ We review a district court's upward departure from the applicable guideline range to determine whether it was reasonable. 18 U.S.C. § 3742(f). We begin here by noting that both the amount of money and the number of victims of the fraud had already been factored into the calculation of Mandel's base offense level under the Guidelines. § 2F1.1. Accordingly, if we are to avoid double-counting, the departure can be valid only if it was based on psychological harm to the victims. § 5K2.3.

▮ The evidence of psychological injury to warrant a departure was relatively meagre. While Ms. Hoffman testified that she suffered a nervous breakdown, she never bluntly stated that Mandel's conduct was the primary, or even a major, factor in the breakdown. When asked whether Mandel's failure to repay her had affected her health, she responded, "I think so. I was extremely upset about it." In Ms. Horowitz's letter to the Probation Officer preparing Mandel's PSR, she stated that when she learned of the extent of the fraud she was initially shocked, lost her job because of it, and had seen a therapist until she could no longer afford it. She further stated that the experience had made her reticent to pursue romantic interests in other men.

We neither deprecate nor minimize the trauma suffered by both women. However, we are not satisfied that those injuries,

standing alone, support the upward departure when it is recalled that both the base offense level for fraud and the vulnerable-victim adjustment had already taken into account the harm to the victims. Fraud will generally tend to reduce its victims' self-esteem, as well as their bank accounts. Moreover, the fact that Mandel frequently victimized older women to whom he feigned a romantic attraction had already been addressed in the vulnerable-victim upward adjustment. The record here simply does not support a finding that there was a "circumstance of a kind, or to a degree, not adequately taken into consideration ... in formulating the guidelines." 18 U.S.C. § 3553(b); *see also United States v. Fawbush,* 946 F.2d 584, 586 (8th Cir.1991) (upward departure under § 5K2.3 is unreasonable where the only evidence supporting departure was fact that four-year-old, sexual-abuse victim and her family had undergone therapy, and probation officer's testimony that sexual-abuse victims of a tender age suffer psychological harm to a greater extent than adults); *United States v. Zamarripa,* 905 F.2d 337, 341 (10th Cir.1990) (departure not adequately supported by testimony of emotional trauma from ten-year-old, sexual-assault victim's therapist, where "the therapist was unable to state that the harm to the victim was greater than normal").

The government urges us to rely on *Pergola,* where it believes we "approved an upward departure ... based exclusively upon psychological harm to the victim." This is a distortion of *Pergola,* where we found that "it would have been impossible to compartmentalize the inquiry" into whether the departure was based on a finding of psychological harm under § 5K2.3, or on a finding of "extreme conduct" by the defendant, which may serve as a basis for departure under § 5K2.8. 930 F.2d at 219. Because we concluded that the combination of these factors in *Pergola* supported the district court's departure, nominally made under § 5K2.3, we affirmed.

*Id.* Here, by contrast, the record is compartmentalized. It clearly indicates that the upward departure was based solely on psychological injury. Accordingly, *Pergola* is inapposite. Because we conclude that here there was insufficient evidence to warrant an upward adjustment, we vacate and remand.[1]

On remand, the district court is free to revisit this issue. Upon review of the record, the court may again impose an upward departure for psychological harm; but it must state explicitly why the harm was not adequately taken into consideration when it calculated Mandel's base offense level under the Guidelines. *See, e.g., United States v. Campbell,* 967 F.2d at 26–27.

We have carefully reviewed Mandel's remaining points on appeal, including his contention that the district court's conduct at the *Fatico* hearing deprived him of due process, and his argument that the consecutive sentences violate double jeopardy. We find them to be without merit.

VACATED and REMANDED.

---

**1.** We also note that in calculating the sentence, the district court reduced the amount of money attributable to the fraud from $1,536,000 to $1,358,600, which should have reduced Mandel's base offense level one point. U.S.S.G. § 2F1.1(b)(1). However, this reduction was not reflected in the district court's calculation of Mandel's base offense level. Defense counsel should have brought this matter to the court's attention at sentencing, but failed to do so. This technical error should also be addressed on remand.