

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-2001

# United States v. Jarvis

Precedential or Non-Precedential:

Docket 00-1514

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Jarvis" (2001). *2001 Decisions.* Paper 151.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/151

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 19, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1514

UNITED STATES OF AMERICA,

v.

JOHN T. JARVIS,

      Appellant.

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court Judge: Alan N. Bloch
(D.C. Crim. No. 99-00173-1)

Argued: October 24, 2000

Before: BECKER, Chief Judge, SCIRICA and
FUENTES, Circuit Judges.

(Opinion Filed: July 19, 2001)

      Lisa B. Freeland (argued)
      Office of the Federal Public Defender
      960 Penn Avenue
      415 Convention Tower
      Pittsburgh, Pennsylvania 15222
      Attorney for Appellant

      Bonnie R. Schlueter (argued)
      Office of the United States Attorney
      633 U.S. Post Office & Courthouse
      Pittsburgh, Pennsylvania 15219
      Attorney for Appellee

OPINION OF THE COURT

FUENTES, Circuit Judge:

This is an appeal of a five-level upward departure from the fraud sentencing guideline. In December 1999, John T. Jarvis pled guilty to one count of mail fraud in violation of 18 U.S.C. SS 1341 and 1342. He admitted to participating in two separate fraudulent schemes that bilked investors of more than $880,000. The Presentence Investigation Report ("PSR") set Jarvis' guideline sentencing range at 24 to 30 months. However, after determining that Jarvis caused psychological injury to his victims and knowingly endangered their solvency, the district judge imposed a five-level upward departure and sentenced him to a 60-month prison term. On appeal, Jarvis claims that his conduct did not go beyond the heartland of typical fraud cases, and that the court misapplied the guidelines. We find no abuse of discretion and will therefore affir m.

I.

The charges against Jarvis arose fr om his employment with Penn Capital Financial Service ("Penn Capital"), a corporation registered as a broker -dealer with the Securities and Exchange Commission. At his guilty plea hearing, Jarvis admitted that, from April 1989 to October 1994, he knowingly participated in two separate fraudulent investment schemes, one involving the purchase, rehabilitation, and sale of public housing pr operty, and the other a fraudulent stock investment scheme concer ning Penn Capital stock.

The total loss attributable to Jarvis for both schemes is $883,859. The total number of victims was 27.1 After discounting the monies returned to investors, the actual loss they sustained in both schemes amounted to

_____

1. There were 31 separate investments, but because several individuals invested in both fraudulent schemes, the total number of victims was 27.

$316,743. However, no victim of the frauds who received money back was paid directly from funds of Jarvis or Penn Capital. Instead, the repayments were derived from other fraudulently obtained funds originating from other defrauded investors.

For sentencing purposes, the PSR calculated Jarvis' adjusted offense level at 16. This offense level, combined with a criminal history category of II, gave Jarvis a guideline sentencing range of 24 to 30 months. Although victim impact statements had been received from 8 victims, the PSR did not recommend any victim-related adjustments in Jarvis' offense level, and neither Jarvis nor the Government objected to the PSR. On April 6, 2000, the District Court informed the parties that a two-level increase for abuse of a position of trust under U.S.S.G. S 3B1.3 applied, and that a further two-level vulnerable victim enhancement under U.S.S.G. S 3A1.1 might be applicable.[2]

A sentencing hearing was held on April 13 and 27, 2000, during which evidence relating to victim impact was obtained. The District Court heard testimony from several of Jarvis' victims. Nathan Patrick Hager testified that Jarvis had defrauded him and his wife of their entire life savings, and all his retirement funds (about $207,000) while knowing that their only son was dying of cancer. According to Hager, Jarvis had promised a 9% return on his investment and assured him that no loss was possible because the investment was guaranteed by the state.

Sophie Palladini stated that she did not know Jarvis before he visited her home and introduced her to Penn Capital. Ultimately, the court found Jarvis responsible for her loss of $70,799.

Michael Esper, who at the time was 79 years old, testified that Jarvis fraudulently induced him and his spouse to invest all of the money they had received from the sale of their home when they moved into an apartment. This apparently amounted to $80,000, which Jarvis guaranteed would be invested safely.

_____

2. All citations to the Sentencing Guidelines refer to the 1998 edition, which was used in the PSR.

3

Additionally, the Government made an evidentiary proffer concerning the testimony of several other individuals who were present in the courtroom. Accor ding to the proffer, Anne Marie Kmonk would have testified that she was 57 years old when she invested $219,371 with Jarvis and ultimately received back about $152,035 of her initial investment. She had also communicated directly with the sentencing court by letter, stating that she and her spouse had suffered health problems br ought on by Jarvis' fraudulent activities.

Anne Wolas would have testified that she was 82 years old and that her loss from dealing with Jarvis was about $45,440. She also would have told the court that Jarvis had visited her home, that he could see that it was modest, and that it had a value of approximately $65,000. Finally, she would have testified that Jarvis induced her to invest in the fraudulent housing scheme by transferring money from a legitimate investment she had in VMS Vanguard Mortgage, representing to her that the housing investment was a branch of Vanguard.

Finally, William Becker was prepar ed to testify that he was temporarily laid off in 1993, permanently in 1994, and was 52 years old when he retired. He r eportedly would have testified that, when he invested $8,000 in December 1993, he told Jarvis that he needed monthly income due to the layoff and that he received six inter est payment checks from Jarvis beginning in January 1994. The court eventually found that Becker would have lost his entire life savings of $170,000 had Jarvis succeeded in convincing him to invest it with Penn Capital.

The District Court continued the sentencing hearing until April 27, 2000. Soon after, the court filed an order notifying the parties that it was considering an upwar d departure from the Sentencing Guideline range because Jarvis' conduct went beyond the heartland of typical fraud cases.

Thereafter, when the sentencing hearing resumed, the court called Agnes Kato to testify about her losses. Kato stated that her son-in-law, John Palladini, had intr oduced her to Jarvis, and she subsequently invested appr oximately $9,000 in the fraudulent schemes. Jarvis told her she

4

would receive paperwork to document her investment, but she never did. The court then asked Kato if she had told Jarvis why she sought to save money, to which she responded that she had told him that she wanted the money to provide for the welfare of her son, who became disabled after a brain aneurysm.

At the conclusion of the hearing, the District Court made the following determination:

> The particular facts underlying defendant's criminal conduct cannot be captured by the adjustments set forth in the guidelines. Rather, defendant's predatory conduct and the reasonably foreseeable consequences of his action undoubtedly remove this case fr om the heartland of fraud cases addressed in the guidelines. Accordingly, the Court finds that an upwar d departure is warranted.

Following this finding, the court first imposed a four-point enhancement to Jarvis' offense level for abuse of trust and vulnerable victims. Based on the PSR's adjusted of fense level of 16, this resulted in an offense level of 20. Jarvis does not challenge these enhancements.

This appeal results from the District Court's subsequent imposition of a further five-level upward departure on two grounds suggested in the commentary to the fraud guideline: (1) that "the offense caused reasonably foreseeable[ ] physical or psychological harm or severe emotional trauma," U.S.S.G. S 2F1.1, comment. n.11(c), and (2) that "the offense involved the knowing endangerment of the solvency of one or mor e victims," U.S.S.G. S 2F1.1, comment. n.11(f). The court also invoked U.S.S.G. S 5K2.3, which addresses extr eme psychological injury, as additional support for this five-level upward departure. This increased Jarvis' of fense level from 20 to 25, which, combined with his criminal history category of II, resulted in a guideline range of 63 to 78 months. The District Court sentenced Jarvis to 60 months of incarceration after applying the statutory maximum applicable to each of the three counts in the indictment. The court also imposed three years of supervised release, and ordered Jarvis to pay $316,743 in r estitution.

5

A sentencing court's decision to depart from an applicable guideline range is generally entitled to substantial deference and hence is subject to r eview for an abuse of discretion. Koon v. United States , 518 U.S. 81, 98–100 (1996). Factual findings are reviewed for clear error. See 18 U.S.C. S 3742(e); United States v. Helbling, 209 F.3d 226, 242–43 (3d Cir. 2000). Whether " `the facts found by the district court warrant application of a particular guideline provision is a legal question and is to be reviewed de novo.' " United States v. Wilson , 106 F.3d 1140, 1142–43 (3d Cir. 1997) (quoting United States v. Partington, 21 F.3d 714, 717 (6th Cir. 1994)).

II.

Jarvis initially contends that the District Court lacked the authority to depart upward from the guideline range on the basis of psychological injury and knowing endangerment of victim solvency. We r eject this contention. Certainly, the Sentencing Guidelines allow a sentencing judge to take note of the consequences of a fraud scheme that extends beyond the immediate financial loss. The sentencing judge may depart from the guidelines if the judge finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C.S 3553(b). Further, where "the [monetary] loss . . . does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted." U.S.S.G. S 2F1.1, comment. n.11. Specifically mentioned as factors outside the heartland of the fraud guideline are "r easonably foreseeable . . . psychological harm or severe emotional trauma" and the "knowing endangerment of the solvency of one or more victims." U.S.S.G. S 2F1.1, comment. nn.11(c), (f); see also U.S.S.G. S 5K2.3 (policy statement authorizing departure for extreme psychological injury).

III.

We next address whether the District Court was justified in upwardly departing based on at least one victim having

6

suffered psychological harm. The commentary to the fraud guideline states, "In cases in which the loss determined under subsection (b)(1) does not fully captur e the harmfulness and seriousness of the conduct, an upward departure may be warranted. Examples may include the following: . . . . (c) the offense caused r easonably foreseeable, physical or psychological har m or severe emotional trauma . . . ." U.S.S.G. S 2F1.1, comment. n.11. The Sentencing Commission has also provided a policy statement delineating when severe emotional trauma falls outside the heartland: "If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the of fense, the court may increase the sentence above the authorized guideline range." U.S.S.G. S 5K2.3 (emphasis added). Section 5K2.3 further provides that an upward departur e for psychological injury may be imposed:

> only when there is a substantial impair ment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. The court should consider the extent to which such harm was likely, given the natur e of the defendant's conduct.

Id.

Jarvis contends that the District Court erred in upwardly departing because the evidence and factual findings were insufficient to establish that any of the victims suffered any psychological injury. We disagree. In its ruling, the District Court made specific findings of fact that wer e necessary to its guideline disposition:

> [D]efendant's victims include blue collar workers who had worked hard and saved many years to be able to enjoy their retirement. Some of those who lost very large sums had acquired the money thr ough their retirement such as a pension fund; another through the sale of the family home. Due to the defendant's conduct, many of his victims will be forced to live their

7

retirement years in destitution. Defendant has taken away the security and comforts that his victims' lifetime of hard work would have otherwise pr ovided them. Defendant intentionally took money from people whom he knew to be of or near advanced age and who were uneducated investors, convincing them to hand over their entire life savings and retir ement funds.

Defendant's actions resulted in for eseeable psychological harm, severe emotional trauma, and involved the knowing endangerment of the solvency of one or more of his victims.

Mr. and Mrs. Nathan Hager are curr ently on depression medication and see a mental health professional in order to deal with their losses.

Many victims, including Anna Marie and Thomas Kmonk, have lost their entire savings with little hope of regaining financial security.

There is a distinction between defrauding a thirty-year old of his life savings and defrauding a sixty-year old of his life savings. Defendant could for esee the unlikelihood of his victims recouping their loss.

. . . .

In over twenty years as a judge on the bench, this is one of the most egregious cases of fraud that this Court has seen. The loss calculation determined under Section 2F1.1 of the guidelines does not fully capture the harmfulness and seriousness of the defendant's conduct.

Further, this harmfulness and seriousness is not adequately addressed by the enhancements for a vulnerable victim and more than minimal planning. While the victim of any fraud would certainly experience emotional distress upon the r ealization that their money was gone, the psychological harm caused by defendant was much more serious than that which would normally be experienced by a fraud victim. To steal the means by which persons worked to support themselves in their retirement years, to take the money that an elderly couple realized at the sale of their

8

largest asset, the family home, to take a couple's savings at the same time they are forced to bury their only child, to take an elderly woman's savings meant to secure a funeral for her disabled son, subjected the defendant's victims to psychological injury which exceeds that which could be expected in a run of the mill fraud case.

Defendant knew of his victims' circumstances and he certainly would have foreseen the effects his actions would have upon his victims. Defendant's fraudulent actions ended in 1994 and yet, this was when his victims' nightmares were only beginning.

As evidenced by the presence of the victims in this courtroom and the letters submitted to this Court, defendant's victims continue to suffer fr om his actions, desperately seeking to regain some of the money that they have lost and with it some comfort in their retirement.

The particular facts underlying defendant's criminal conduct cannot be captured by the adjustments set forth in the guidelines. Rather, defendant's predatory conduct and the reasonably foreseeable consequences of his action undoubtedly remove this case fr om the heartland of fraud cases addressed in the guidelines. Accordingly, the Court finds that an upwar d departure is warranted.3

The District Court's findings are not clearly erroneous, and under our de novo review we agree with the court's application of those facts to the guidelines. Jarvis' fraudulent scheme caused several victims to suf fer severe emotional trauma sufficient to justify an upwar d departure for conduct outside the heartland of the fraud sentencing guideline. We have previously ruled that"[w]here any one victim suffers substantial impairment, departure is justified under section 5K2.3." United States v. Astorri, 923 F.2d 1052, 1059 (3d Cir. 1991). That standar d is satisfied in this case, where the District Court found that "Mr. and Mrs. Nathan Hager are currently on depr ession medication and

_____

3. App. at 144–48.

9

see a mental health professional in order to deal with their losses." This finding is supported by Mrs. Hager's letter to the court dated April 22, 2000, in which she wr ote that "[m]y husband and I are on depression medicine and seeing a shrink. (Dr.) The medicine is so expensive." While some level of depression might be thought common to all fraud victims, the condition the Hagers suffer ed was severe enough to require them to seek professional mental health care and to take medication. Thus, the depr ession the Hagers describe is consistent with the terms of U.S.S.G. S 2F1.1, comment. n.11(c), and meets the plain meaning of U.S.S.G. S 5K2.3, which permits an upwar d departure for psychological harm that is "much mor e serious than that normally resulting from commission of the offense."

We also disagree with Jarvis' contention that the District Court could not have found that the Hagers' depr ession "is likely to be of an extended or continuous duration," as required by S 5K2.3. The Hagers' son died from cancer on December 22, 1994. Their letter to the court dated April 22, 2000 stated that Jarvis and his associates had "wiped us out 2 days after I buried him." Thus, the Hagers suffered from significant depression more than five years after Jarvis' scheme. This is confirmed by Mrs. Hager's April 22, 2000 letter, in which she writes: "I have prayed and prayed over the (5) years finding no solution to this pr oblem." In sum, the record sufficiently establishes that the Hagers suffered "a chronic substantial impairment of [their] mental functioning resulting in physical, psychological or behavioral symptoms," justifying a S 5K2.3 upward departure. Astorri, 923 F.2d at 1059.

Jarvis argues that the District Court err ed by attributing the Hagers' mental health problems to his scheme while overlooking that those problems were caused by the contemporaneous death of their only son from cancer. This contention ignores Mrs. Hager's letter, which is replete with references to the health problems the couple suffered as a result of Jarvis' fraud -- not the death of their son. She wrote, for instance, that "[i]t has been a struggle to keep going with the stress of th[e] financial problems we are having and [a lot] of health problems." Moreover, in the six-page letter she refers to her son and his death only twice.

10

One of those references stated that Jarvis and his associates at Penn Capital "wiped us out 2 days after I buried him. They knew he was dying."[4]  These references support the District Court's enhancement because they underscore the fact that Jarvis could r easonably foresee the devastating impact his fraud would have on the Hagers as a result of their ordeal with their son's cancer.

Further, the Hagers' health problems ar e similar to those in Astorri, where we upheld an upwar d departure pursuant to S 5K2.3 for severe psychological har m. There, three sets of financial fraud victims were identified as having suffered physical or psychological injury. The evidence showed that one victim had been forced to obtain high blood pressure treatment, and another, who had alr eady been in poor health, "displayed adverse physical and behavioral effects." Astorri, 923 F.3d at 1058-59. The physical or psychological health effects on the third set of victims were not described, apart from the district court judge noting that she had observed the effects being manifested during the trial. See id. at 1058. On that record, we deter mined that the District Court's findings, that at least the first two victims "suffered extreme psychological injury," were not clearly erroneous. Id. at 1059. Similarly, the Hagers' documented mental health problems, which required them to obtain professional care and take medication even years after the fraud occurred, adequately supports a finding that they suffered extreme psychological injury.

The District Court had other evidence upon which to conclude that an upward departure for severe psychological injury was warranted. Anne Marie Kmonk wrote to the District Court that "[i]t is now five years, I am 57 years old[,] have had health problems (myself and my husband) I believe brought on by this stressful situation, and wanted to begin my retirement." Evidence fr om Sophie Palladini was also relevant. Although Jarvis was not dir ectly responsible for defrauding her, the District Court found him at least partly responsible because he intr oduced her to Penn Capital and he should have foreseen that she would

---

4. In her second reference to her son, Mrs. Hager wrote: "I have lost my son, [a lot] of money, many friends, and almost my faith in God."

11

be victimized by the fraudulent scams taking place there. Palladini wrote the court that "all the years for the [loss] of this money emotionally it was very bad and still is." On another occasion she wrote that "[m]y nerves have put me in the hospital over this."

Jarvis relies on our decision in United States v. Neadle, 72 F.3d 1104 (3d Cir. 1996), to ar gue that an upward departure for severe psychological har m was not justified. There, we reversed a district court's upward departure for the psychological and social harm imposed on the people of the Virgin Islands when an insurance company the defendant had created fraudulently obtained an insurance license but was subsequently unable to meet its claim obligations after Hurricane Hugo. See id. at 1106, 1111-12. The completely speculative grounds upon which the adjustment was applied in Neadle to an entir e population is wholly distinguishable from the recor d presented in this case, which shows discrete instances of sever e psychological trauma with respect to several specific individuals.

The other cases upon which Jarvis relies ar e either distinguishable or appear at odds with the rule in Astorri that a S 5K2.3 upward departure is justified whenever one victim suffers severe psychological har m. In United States v. Pelkey, the First Circuit Court of Appeals concluded that the emotional trauma, including depression, r esulting from a fraud was inadequate to uphold an upward departure under S 5K2.3. See 29 F.3d 11, 16 (1st Cir. 1994). Pelkey, however, can be distinguished because ther e was no evidence that any victim needed treatment. Id. By contrast, the Hagers did require treatment. Mor eover, given the law of this circuit, Pelkey is a questionable decision to the extent that it found insufficient evidence despite the fact that a victim reportedly experienced moments of extreme despair leading to suicidal ideations. See id.  In United States v. Mandel, the Second Circuit Court of Appeals also reversed an upward departure based upon severe psychological harm. See 991 F.2d 55, 58-59 (2d Cir. 1993). However, whether the same decision would have been reached in this circuit is questionable because the evidence there showed that, after the shock of lear ning about the

12

fraud, one victim lost her job and needed to see a therapist, stopping only when she could no longer affor d it. See id. at 58. Thus, Mandel also appears inconsistent with our rule that a S 5K2.3 upward departure may be applied when at least one victim suffers severe psychological injury.

We conclude, therefore, that the District Court's factual findings are not clearly erroneous, and we are satisfied that the District Court's application of the facts to the sentencing guidelines was justified. Thus, we will affirm the upward departure for psychological injury.

IV.

We now turn to whether the District Court abused its discretion in upwardly departing for knowing endangerment of victim solvency. The fraud guideline encourages heartland departures when a defrauding party endangers the solvency of at least one victim. "In cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted. Examples may include the following: . . . the offense involved the knowing endangerment of the solvency of one or mor e victims." U.S.S.G. S 2F1.1, comment. n.11(f).

Jarvis argues that the District Court abused its discretion because (1) some of its findings regarding the victims' financial condition were clearly err oneous, and (2) the remaining findings were insufficient to sustain the departure because no victim was actually r endered insolvent. The Government disagrees, ar guing that an upward departure is warranted if the evidence indicates an endangering risk of insolvency, a standard that it alleges is met on this record. Thus, the primary point of dispute is whether the relevant standard requir es a showing of actual insolvency or merely the potential of insolvency. We agree with the Government on this issue.

Admittedly, Jarvis arguably has at least one precedent favoring his position that actual insolvency is the relevant inquiry. In a footnote in United States v. Pelkey, the First Circuit Court of Appeals stated that "[a] departure based on [the ground of knowing endangerment of victim solvency]

13

requires a court to find that a defendant knowingly pushed a victim into extreme financial hardship." 29 F.3d at 15 n.5.

However, the propriety of Jarvis' suggested actual insolvency standard is highly questionable given the plain language of the fraud guideline's application note 11(f). That note refers to "knowing endanger ment" of solvency. "Endangerment" necessarily refers to potentiality. For example, a common definition of "endanger" is "to bring into danger or peril of probable har m or loss." Webster's New Int'l Dictionary 748 (3d ed. 1993) (emphasis added). Thus, the Sentencing Commission's language appears to indicate a concern with knowingly exposing a victim to a significant risk of insolvency. Its language is not consistent with a requirement of actual insolvency, which is the standard that Jarvis embraces and Pelkey arguably endorsed.

Other than Pelkey, every other court of appeals that has addressed the issue of endangerment of victim solvency has applied a potentiality standard instead of the one Jarvis advocates. See United States v. Hogan, 121 F .3d 370, 373 (8th Cir. 1997) (noting serious endanger ment to solvency, as opposed to actual insolvency); United States v. Ross, 77 F.3d 1525, 1533-36, 1551 (7th Cir. 1996) (referring to "[t]he extreme risk of victim insolvency in this case" and that "the crushing weight of . . . student loans spelled almost certain insolvency");5 see also United States v. Kaye, 23 F.3d 50, 51-53 (2d Cir. 1994) (upholding upwar d adjustment for rendering victim "financially dependent on the generosity of others, quite possibly for the rest of her life," despite the fact that the victim, who was defrauded of $893,700, had $180,995 returned and spent $40,000 "in an effort to recoup her losses").

Consistent with the majority trend, we conclude that an upward departure for knowing endanger ment of victim solvency is appropriate when a preponderance of the

_____

5. In Ross, the guideline language concer ning knowing endangerment of victim solvency was identical to that which pr esently exists, but at the time was codified at application note 10(f) to U.S.S.G. S 2F1.1. See 77 F.3d at 1551.

14

evidence demonstrates that a defendant knew, or should have known, that the fraud potentially endanger ed the victim's solvency. Actual insolvency is not r equired. This standard may be satisfied even where the risk is limited to the victim's liquid assets. See Kaye, 23 F .3d at 51.

The facts presented in this case meet that standard. Jarvis fraudulently divested Wolas of her liquid assets, amounting to $45,444.6 Jarvis ar gues that he did not endanger Wolas' solvency because she r etained at least one known significant asset, a house worth $65,000. W e reject this argument. Solvency should be consider ed primarily in terms of liquid assets so that a defrauding party cannot escape a higher sentence, based on the mere fortuity that his victim retains an asset such as a home, where the victim's ability to remain in the home is sever ely undermined due to the fraud. See id. (affirming upward departure under S 2F1.1 for extent offinancial loss where victim was deprived "of most if not all of her liquid assets, leaving her to rely on the generosity of others, quite possibly for the rest of her life") (emphasis added).

In addition, the preponderance of the evidence in this case showed that Jarvis knowingly endangered the solvency of other victims. He knew, for instance, that he was endangering the solvency of Nathan Hager, who invested all of the proceeds he received upon leaving his employer (approximately $207,000) with Penn Capital. Although Jarvis invested this money in legitimate mutual funds, he knew that he was potentially endangering Hager's solvency by encouraging Hager to invest with Penn Capital. Jarvis' recognition of this risk is demonstrated by the testimony of Scott Lindstrom, a Penn Capital broker fr om May 1993 to January 1995, who stated that, after Jarvis left Penn Capital, Jarvis asked Lindstrom to contact the Hagers and warn them to get their money back and not make future

_____

6. This is the amount the District Court or dered Jarvis to pay in restitution to Wolas. Wolas herself described her losses as larger in a letter dated December 23, 1999: "It is to my gr eat sorrow that I have lost
$55,000 plus all interest that I could have r eceived from the last six years. This represents the savings that my husband and I counted on to get us through our old age. There is no chance that we will be able to save enough money to make up for this tremendous loss."

investments with Penn Capital. However, by the time Lindstrom contacted the Hagers, another Penn Capital broker had induced them to liquidate their legitimate mutual funds and invest in the fraudulent investment products. Ultimately, the investment led to Nathan Hager's loss of his "life savings plus [his] life's pension of thirty years." Although Jarvis was not held responsible for this loss, the District Court did not err in considering it as relevant sentencing information. See U.S.S.G. S 1B1.3(a) (offense level is to be determined on the basis of (1) all acts and omissions aided, abetted, and induced, and (2) in the case of jointly undertaken criminal activity, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," and (3) all resulting harm from those acts or omissions).

Jarvis also knowingly risked endangering the solvency of Becker. Although Becker invested only $8,000 with Jarvis, the evidence established that Jarvis had attempted to induce Becker to invest his $170,000 retir ement account with Penn Capital. It was only because Becker had r esisted and chose instead to invest that money with a r eputable investment firm that he had not lost it to Penn Capital's fraudulent schemes.

In sum, we are satisfied that the District Court's upward departure for knowing endangerment of victim solvency was justified.7

V.

Having decided that the grounds upon which the District Court decided to upwardly depart were valid, we finally turn to Jarvis' claim that the extent of the departure was unreasonable. See 18 U.S.C. S 3742(e)(3). Our review:

_____

7. Jarvis correctly points out that the District Court erred in finding that
"Anne Marie and Thomas Kmonk[ ] have lost their entire life savings with little hope of regaining financial security." The record indicates that, although the Kmonks had invested $219,371.64 in the Housing Fund and stock schemes with Jarvis and Penn Capital, they received back $152,035 by operation of the fraud scheme. However , this sole factual error in the context of the other factual findings, by the District Court, does not vitiate our upholding the upward departure in this case.

16

> looks to the amount and extent of the departur e in light of the grounds for departing. In assessing reasonableness . . . court of appeals [ar e] to examine the factors to be considered in imposing a sentence under the Guidelines, as well as the district court's stated reasons for the imposition of the particular sentence. A sentence thus can be "reasonable" even if some of the reasons given by the district court to justify the departure from the presumptive guideline range are invalid, provided that the r emaining reasons are sufficient to justify the magnitude of the departure.

Williams v. United States, 503 U.S. 193, 203–04 (1992) (citation omitted).

Here, the District Court applied a five-level upward departure based upon the combined factors of severe psychological injury and knowing endangerment of victim solvency. We note that the District Court lumped the two bases (psychological injury and victim insolvency) into one overall departure of five levels, ther eby making it difficult to examine whether the extent of the departure on each basis was reasonable.

Nevertheless, the District Court would have been well within its discretion in upwardly departing four levels based upon combining the factors of severe psychological injury and knowing endangerment of victim solvency. W e have previously approved a two-level upwar d departure for severe psychological injury under S 5K2.3 under circumstances somewhat similar to those in Jarvis' case. See United States v. Astorri, 923 F.2d 1052, 1058–59 (3d Cir. 1991). As for knowing endangerment of victim solvency under S 2F1.1, comment. n.11(f), another court of appeals has approved a two level upward departur e on that ground under circumstances that are comparable to those in Jarvis' case. See United States v. Hogan, 121 F.3d 370, 373 (8th Cir. 1997).

We need not decide whether application of the one additional level was erroneous because Jarvis effectively received a three or four level upwar d departure. Despite Jarvis' ultimate guideline range of 63 to 78 months, the court actually sentenced Jarvis to the lower 60-month

17

8. Adjusted offense levels of 23 and 24 (instead of the 25 Jarvis received) would yield, respectively, guideline ranges of 51-63 and 57-71 months. See U.S.S.G., ch. 5, pt. A (sentencing table).

statutory maximum imprisonment term. The dif ference between Jarvis' final guideline range and his actual sentence worked to reduce the District Court's effective upward departure: a three or four level upward departure would leave Jarvis with a guideline range in which a 60 month sentence could be imposed based on his criminal history category of II.8 Since a four-level departure would have been fully within the District Court's discr etion, no error occurred and no remand is necessary. "If the party defending the sentence persuades the court of appeals that the district court would have imposed the same sentence absent the erroneous factor, then a r emand is not required . . . and the court of appeals may affirm the sentence as long as it is also satisfied that the departur e is reasonable . . . ." Williams, 503 U.S. at 203.

VI.

For the reasons set forth above, we will affirm the District Court's sentence.

18

BECKER, CHIEF JUDGE, CONCURRING IN THE
JUDGMENT.

There can be no doubt, based upon the way in which he treated his victims, that John Jarvis is a despicable person who deserved to have "the book thrown at him." It therefore seems difficult, at first blush, to take issue with Judge Fuentes' forceful opinion affirming the upward adjustments to Jarvis' base offense level under the United States Sentencing Guidelines. But the Guidelines ar e a carefully reticulated set of regulations whose animating goal is the elimination of the former regime in which a judge could react to such terrible conduct by simply imposing a harsh sentence or, conversely, reward a felon with an otherwise exemplary background by "giving him a br eak." The Guidelines establish instead a regime under which: (1) harms are quantified through car eful legal definition; and (2) a range of punishments derived from those definitions is prescribed, subject to a variety of guided departures that depend on objective judicial findings that must be consonant with the Guidelines' terms. Most importantly, sentencing judges are not free to ignor e the strictures of the Guidelines, however untoward they deem the r esult.

Principally at issue here is Guideline S 5K2.3, a guided departure provision, which authorizes the sentencing court to increase the sentence above the normal Guideline range if a victim suffered "psychological injury much more serious than that normally resulting from commission of the offense." The section goes on to explicate this standard as follows:

> Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns.

U.S.S.G. S 5K2.3.

19

The Guidelines text imposes a rigorous standar d of proof, and for good reason. Fraud offenses that involve duping people out of their life's savings will usually cause psychological injury; the greater the loss to the victim, the greater the probable injury. The Guidelines capture most of the harm from fraud offenses by incrementally increasing the sentencing range in accord with the amount of money involved, see U.S.S.G. S 2F1.1(b)(1), or by enhancing the sentencing range for vulnerable victims, see U.S.S.G. S 3A1.1(b). Thus, in S 5K2.3 the Commission apparently wanted to be quite specific as to the showing needed for a psychological injury enhancement so as not to duplicate these other factors.

I do not believe that the evidence upon which the District Court imposed the substantial upward adjustment for psychological harm meets the rigorous standard of the Guidelines, which in essence requires r eliable evidence. More specifically, I believe that neither the uncorroborated letter from Mr. & Mrs. Hager that they are on depression medication and are "seeing a shrink," nor the uncorroborated and vague letter from Anna Marie Kmonk relating that she and her husband "have had health problems . . . I believe brought on by this stressful situation" provides the reliable evidence of psychological injury "much more serious than that nor mally resulting" from the offense that is requir ed by S 5K2.3. Furthermore, these letters are the strongest pieces of evidence in the Government's case; there is nothing comparable respecting the other victims.

The majority's conclusion that these letters meet the S 5K2.3 test is grounded on our opinion in United States v. Astorri, 923 F.2d 1052 (3d Cir. 1991), in which, based on quite similar evidence, the panel affirmed the District Court's upward adjustment for psychological har m. Because I agree with the majority that Astorri controls, I am constrained to join in the judgment of the Court. 1 I write separately because I believe that Astorri was wrongly
_____

1. I note in this regard my agr eement with the segment of Judge Fuentes' opinion dealing with the upward adjustment for knowing endangerment of the victim(s) solvency.

20

decided; my hope is to persuade the Court to take up this case en banc to overrule Astorri, or better still, to convince the Sentencing Commission to revise S 5K2.3 so as to clarify it and make clear that cases of this genr e do not justify an upward adjustment.

Astorri involved a fact pattern very similar to that in the case at bar: the defendant was convicted of defrauding unsuspecting investors, including many elderly persons who thereby lost much or all of their life savings.[2] As in this case, the district court adjusted upward the base offense level for fraud to account for the amount involved in the fraud under U.S.S.G. S 2F1.1, and added a two-level enhancement for vulnerable victims under S 3A1.1. The important adjustment in Astorri for our purposes was the district court's two-level upward departur e under S 5K2.3 for the extreme psychological injury inflicted on the victims of the fraud. When the defendant appealed, the panel majority upheld the departure based on two factors: (1) the district court had gauged the effects on the victims from its observations at trial; and (2) two of the fraud victims had suffered physical and behavioral manifestations of their psychological injury, thus meeting the requir ements of S 5K2.3. As the Court put it: "Mrs. Needles has been forced to seek treatment for high blood pressur e as a result of Astorri's scheme. She continues to be under a doctor's care. . . . Record evidence reveals that Mr . Taylor, already in poor health, displayed adverse physical and behavioral ef fects from those dealings." 923 F.2d at 1059. The basis for these conclusions about the physical effects felt by the victims was two uncorroborated letters, one written by Mr. Taylor's attorney, and one written by the Needles themselves.

I believe that this upward adjustment in Astorri was improper because it was not founded on r eliable evidence, and was not demonstrably justified by psychological injury "much more serious than that nor mally resulting from commission of the offense." U.S.S.G. S 5K2.3 (emphasis added). My point of departure is the dissenting opinion in Astorri of my late respected colleague, Judge William D.

---

2. In another--and odd--bit of similarity between these two cases, both Astorri and Jarvis dated daughters of their fraud victims.

Hutchinson. Indeed, the best way to make my point is to quote (at some length) Judge Hutchinson's wor ds:

The evidence about the effect Astorri's fraud had on the Taylors and the Needles' health is insufficient to support the district court's conclusion that some of the victims suffered the kind of substantial and permanent physical, intellectual or behavioral impairments that Guidelines S 5K2.3 requires befor e an upward departure for extreme psychological injury is authorized. These unsupported lay statements ar e not reliable evidence of the kind requir ed to support enhancement of a guidelines sentence. See, e.g., United States v. Sciarrino, 884 F.2d 95 (3d Cir .) (while hearsay is permissible in determining a guidelines sentence, it must have some degree of reliability), cert. denied, 493 U.S. 997, 110 S. Ct. 553, 107 L.Ed. 2d 549 (1989).

Likewise, I think the sentencing judge's own observations that the psychological trauma naturally resulting from the economic losses Astorri's fraud visited upon his victims and his profound betrayal of the Kronyaks and their daughter is insufficient to show objective symptoms of substantial and continuous intellectual, psychological, emotional or behavioral impairment. Those observations are conclusions that must be founded on reliable evidence under the guidelines. They are not themselves evidence.

Perhaps determinations of crime's effect on its victims would have been better left to the observations and sound discretion of the sentencing judge, but Congress has decided otherwise. See Mistr etta v. United States, 488 U.S. 361, 109 S. Ct. 647, 652, 102 L.Ed. 2d 714 (1989). The Sentencing Commission has acted to implement Congress's decision when it confined the sentencing judge to a relatively narrow sentence range objectively determined on the basis of r eliable evidence that particular effects accompany a particular crime. Even in departures, where a fairly lar ge element of discretion is retained, facts grounded on reliable evidence must show that one of the reasons for departure is present.

22

I do not doubt that a person suffers psychologically when he loses his life's savings, let alone his home. However, I believe any economic loss a victim suffers is otherwise adequately taken into account under Guidelines S 2F1.1(b)(1)(H), adjusting the of fense level for the amount of monetary loss. Likewise, I believe that the age of the victim is taken into account under Guidelines S 3A1.1, relating to vulnerable victims, a section which the district court correctly applied to enhance Astorri's sentence.

Astorri's conduct demonstrates a heartless willingness to trade on the affection of the woman he had promised to marry and the trust she and her parents placed in him while he secretly plundered the savings her parents had reserved against their old age. The common understanding of men and women of every time and place condemns Astorri as a despicable cad. However, the Sentencing Commission has taken Astorri's truly outrageous and cynical manipulation of his fiancee's family for his own private gain into consideration in Guidelines S 3A1.1, r elating to vulnerable victims, and Guidelines S 3B1.3, r elating to abuse of trust.

Guidelines S 5K2.3 focuses elsewher e in permitting enhancement for extreme psychological suf fering. There is no reliable evidence in this r ecord to show such an injury. Although the evidence here is sufficient to support the district court's finding that Astorri's victims were vulnerable and to show that his scheme included the elements of an abuse of trust, it was not sufficient to show any of Astorri's victims suf fered "extreme psychological injury" and so per mit enhancement of his sentence under S 5K2.3.

923 F.2d at 1061-62 (Hutchinson, J., dissenting).

I agree. Although Astorri contr ols the outcome of this case because of the similarity of the facts and evidence used to support the S 5K2.3 departure, the arguments in Judge Hutchinson's dissent ring true. I do not believe that, under the correct interpretation of S 5K2.3, the evidence before the District Court in this case was sufficiently

23

reliable to support the necessary finding of "psychological injury much more serious than that normally resulting from commission of the offense"; the evidence simply does not sufficiently support a finding of "substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim . . . [that] manifests itself by physical or psychological symptoms or by changes in behavior patterns."

Both here and in Astorri, the District Court relied upon the conclusory lay statements of the victims (or their lawyers) and the court's own observations of the victims to support the departure. But the Guidelines (and due process) generally require that evidence used in sentencing be reliable. See, e.g., United States v. Sciarrino, 884 F.2d 95 (3d Cir. 1989). I agree with Judge Hutchinson that the type of evidence employed in Astorri (and in this case) is insufficiently reliable to use as a basis for an upward departure under S 5K2.3. More specifically, I believe that Judge Hutchinson was correct that, because the Sentencing Guidelines generally require an objective basis for a departure or enhancement, something mor e than conclusory, unsupported lay statements and the District Court's "eyeballing" of the victim should be r equired to show the requisite impairment of physical, psychological, or behavioral functioning and the comparative severity of psychological injury.

I do not suggest that expert medical testimony is a prerequisite to a S 5K2.3 departur e (although such testimony would certainly suffice as objective evidence). I do, however, believe that medical evidence is preferable and that, in the absence of detailed and truly compelling lay reports, some sort of medical evidence from an expert should be required––e.g., an affidavit or even a signed letter from a health care provider, or the victim's medical records. In short, the basis for the departure should be more than the naked claims of the victim set forth in a letter .

I believe that we should take up this case en banc to overrule Astorri. This issue arises with some degree of regularity and surely presents an important question. Alternatively, I suggest to the Sentencing Commission that

24

it alter S 5K2.3 (thus effectively overruling Astorri) by adding to the end of that Guideline something like the following:

> In the absence of detailed and truly compelling lay testimony from the victim, a departure by the sentencing court under this section should be based upon objective evidence such as an affidavit or signed letter from the victim's health care pr ovider or a verified copy of the victim's medical recor ds.

An amendment along these lines would provide for an objective basis for upward departures under S 5K2.3 that would make that section consonant with the Guidelines as a whole. The clerk will send a copy of this opinion to the Chair and General Counsel of the Sentencing Commission.

With these thoughts, I join in the judgment of the Court.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit